**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Carlton E. WILSON, Defendant–Appellant.**

No. 98–1256.

United States Court of Appeals,
Seventh Circuit.

Argued May 26, 1998.

Decided Oct. 16, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 16, 1998.

---

2. No mention of § 3B1.2 was made by Mr. Sewell's appellate counsel either.

Stephen B. Clark (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, for Plaintiff–Appellee.

Andrea L. Smith, Office of the Federal Public Defender, East St. Louis, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, and BAUER and COFFEY, Circuit Judges.

BAUER, Circuit Judge.

On September 5, 1997, appellant Carlton Wilson was convicted by a jury of possessing a gun while subject to a protective order, prohibited by a relatively new and obscure portion of 18 U.S.C. § 922. On appeal, Wilson raises a host of issues regarding his conviction, claiming that the statute is unconstitutional, that the district court erred by denying his motions for a judgment of acquittal, that the district court improperly refused to admit one of his exhibits, and that the district court erroneously failed to tender two of his proposed instructions to the jury. Wilson also attacks his sentence. As we discuss below, we find that 18 U.S.C. § 922(g)(8) is constitutional and that the district court did not commit any errors with regard to Wilson's conviction or sentence, and we therefore affirm.

## BACKGROUND

The following facts are drawn from the record in the underlying jury trial and are viewed in a light most favorable to the government. *United States v. Wingate,* 128 F.3d 1157, 1158 (7th Cir.1997). On September 10, 1996, Illinois State Trooper Mari Kay Rolape ("Rolape") stopped to assist appellant Carlton Wilson ("Wilson"), whose pickup truck was pulled over on the side of eastbound Illinois Route 146. In the course of running a routine check on Wilson's driver's

license, Trooper Rolape learned of an outstanding arrest warrant against Wilson for failure to appear in court. As Trooper Rolape talked to Wilson about the warrant, fellow State Trooper Bill Jacques ("Jacques") arrived on the scene and eventually placed Wilson under arrest. During a subsequent inventory search of Wilson's truck, Trooper Jacques found a .12 gauge shotgun contained in a case and a MAC 90 Sportster rifle on the floorboard behind the driver's seat. In addition, Trooper Jacques found a loaded nine-millimeter Locrin handgun in a fanny pack that Wilson had been wearing immediately prior to his arrest. On March 5, 1997, Wilson was indicted in the United States District Court for the Southern District of Illinois for possessing a firearm in and affecting interstate commerce while subject to an order of protection, pursuant to 18 U.S.C. § 922(g)(8).

At the time of his arrest, Wilson was subject to an order of protection stemming from divorce proceedings initiated by Wilson's (now ex-) wife, Angela Wilson. Carlton and Angela had been married on June 1, 1991, and Angela filed for divorce in Crawford County, Illinois, in 1994. On August 15, 1995, Angela and her attorney, William Thomas ("Thomas"), obtained an emergency order of protection against Wilson, with which he was subsequently served. The order stated that a further hearing would be held on September 1, 1995, and Wilson (as well as Angela and Thomas) appeared in court that day. At that time, while acting *pro se*, Wilson first filed a motion with Circuit Court Judge Hill to vacate a default dissolution of marriage that had been entered in favor of Angela and a motion to have Judge Hill recuse himself from the case. The Judge granted both of Wilson's motions, and Judge David Correll took over the case. Wilson, Thomas, and Judge Correll then retired to Judge Correll's chambers for the scheduled hearing on the entry of a plenary order of protection ("plenary order") against Wilson while Angela and Wilson's mother, who was also present, waited outside.[1]

The testimony at trial revealed that the meeting in Judge Correll's chambers lasted no more than ten minutes. During the meeting, Judge Correll explained the proposed order of protection to Wilson, who indicated that he did not have a problem with any of its terms. The parties also discussed child support payments and a visitation schedule for Wilson. On September 15, as was custom, Thomas presented a written version of the order of protection to Judge Correll for his signature, and the order was signed and entered in the court's docket. This order was never rescinded, and was in effect on the date that Wilson was arrested by Trooper Jacques.

Wilson went to trial before a jury on September 2, 1997, and was convicted on September 5, 1997. On January 29, 1998, Wilson was sentenced to 41 months in prison, given a $7,500 fine and a $100 special assessment, and placed on supervised release for three years following his imprisonment. Wilson filed a timely notice of appeal, and presently challenges the constitutionality of § 922(g)(8), several rulings of the district court prior to and during trial, and his sentence. We discuss each of his contentions in turn.

## ANALYSIS

### I. Constitutionality of Statute

As stated above, Wilson was convicted for possessing a gun in interstate commerce while subject to a protection order, in violation of 18 U.S.C. § 922(g)(8). This statute states:

It shall be unlawful for any person—

. . .

(8) who is subject to a court order that—

(A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;

---

1. Under Illinois law, a plenary order of protection can be valid for up to two years and can be issued only after a hearing, while an emergency order is good for only several weeks and may be issued *ex parte*.

(B) restrains such · person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and

(C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury . . .

. . .

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

Wilson first challenges his conviction by arguing that § 922(g)(8) is unconstitutional for a variety of reasons. The district court rejected these arguments, finding that the statute passed constitutional muster. We review the district court's determination of the constitutionality of a federal statute *de novo*. *United States v. Black*, 125 F.3d 454, 458 (7th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1821, 140 L.Ed.2d 957 (1998).

### 1. Commerce Clause

■ First, Wilson alleges that § 922(g)(8) violates the Commerce Clause. The standard of Commerce Clause review is narrow and deferential, since the Commerce Clause is a grant of plenary authority to Congress. This power, complete in itself, may be exercised to its utmost extent and is susceptible to no limits except for those prescribed in the Constitution. *United States v. Kenney*, 91 F.3d 884, 887 (7th Cir.1996) (citing *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981) (other citations omitted)). Accordingly, our task is merely to determine whether Congress could have had a rational basis for utilizing its Commerce Clause powers and to ensure that the regulatory means chosen were "reasonably adapted to the end permitted by the Constitution." *Id.* (quoting *Hodel*, 452 U.S. at 276, 101 S.Ct. 2352). It is also up to the courts to ultimately decide whether Congress exceeded its constitutionally enumerated powers in enacting the statute at issue. *Id.* (citing *United States v. Wilson*, 73 F.3d 675, 680 (7th Cir.1995), *cert. denied*, —— U.S. ——, 117 S.Ct. 46, 136 L.Ed.2d 12 (1996)).

■ The Commerce Clause gives Congress the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. CONST. art. I, § 8, cl. 3. The Supreme Court has identified three areas of activity which may be regulated by Congress under the commerce power. First, it may regulate the use of the channels of interstate commerce. Second, Congress can regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though threats may only come from intrastate activities. Finally, Congress can regulate activities which have a substantial relation to interstate commerce; that is, those activities which "substantially affect" interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (citations omitted).

In *Lopez*, a case on which Wilson heavily relies, the Supreme Court invalidated 18 U.S.C. § 922(q), which was added to the Code by the Gun-Free School Zones Act of 1990. The statute made it a federal offense for any individual to "knowingly . . . possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." The Court determined that a proper analysis of Congress' power to enact the statute had to be undertaken under the third category above, since § 922(q) did not regulate the use of the channels of interstate commerce or seek to protect an instrumentality of interstate commerce or a thing in interstate commerce. 514 U.S. at 559, 115 S.Ct. 1624. Emphasizing that legislation regulating economic activity which substantially affects interstate commerce will be sus-

tained, the Court found that § 922(q) exceeded Congress' power. *Id.* at 560, 115 S.Ct. 1624.

First, the Court noted that while it has upheld Congressional acts regulating intrastate activities which substantially affect interstate commerce, it found that § 922(q) was a criminal statute which, by its terms, had nothing to do with commerce or any type of economic enterprise. It also was not an essential part of a larger regulation which would be undercut unless the intrastate activity were regulated, and the Court found that the statute could not be sustained under precedent upholding the regulation of activities that arise from or are connected with a commercial transaction which, when viewed in the aggregate, substantially affects interstate commerce. *Id.* at 559–61, 115 S.Ct. 1624. Second, the Court found that § 922(q) contained no jurisdictional element that ensured, through case-by-case inquiry, that the firearm possession in question affects interstate commerce. *Id.* at 561, 115 S.Ct. 1624. Finally, the Court stated that while it could also examine legislative findings to determine the constitutionality of a statute, Congress had made no express findings regarding the effects upon interstate commerce of possessing a gun in a school zone. *Id.* at 562, 115 S.Ct. 1624. For all these reasons, the Court found that the statute could not be justified by the Commerce Clause and held it invalid. Wilson asserts that the constitutionality of § 922(g) must be analyzed under the "substantial affect on interstate commerce" prong of *Lopez.* While the government disagrees, we believe that the third prong is the appropriate analysis to be applied here. However, unlike the Supreme Court in *Lopez,* we find that the statute challenged here passes constitutional muster.

Unlike former § 922(q),[2] § 922(g)(8) contains a jurisdictional element. The statute clearly prohibits certain individuals from "ship[ping] or tranport[ing] in interstate or foreign commerce, or possess[ing] in or affecting commerce, any firearm or ammunition" or "receiv[ing] any firearm or ammuni-

tion which has been shipped or transported in interstate or foreign commerce." In *United States v. Pierson,* 139 F.3d 501 (5th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 220, —— L.Ed.2d —— (1998), the Fifth Circuit, in the only other appellate opinion addressing § 922(g)(8), held that "[b]y expressly requiring a nexus between the illegal firearm and interstate commerce, Congress has exercised its delegated power under the Commerce Clause to reach 'a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce.'" *Pierson,* 139 F.3d at 503 (quoting *Lopez,* 514 U.S. at 562, 115 S.Ct. 1624). We agree with this reasoning, and we similarly find that the jurisdictional element contained in § 922(g) establishes the requisite nexus with interstate commerce. Furthermore, as the Fifth Circuit noted, courts have upheld the constitutionality of § 922(g)(1), the "felon in possession" statute, which shares the same jurisdictional element with § 922(g)(8). *See, e.g., United States v. Bell,* 70 F.3d 495, 498 (7th Cir.1995); *United States v. Rawls,* 85 F.3d 240, 242 (5th Cir. 1996). As we noted in *Bell,* the jurisdictional element required "the government ... to prove exactly what *Lopez* found missing under § 922(q)." 70 F.3d at 498. Therefore, the present statute, unlike the one at issue in *Lopez,* contains a jurisdictional element that brings it within Congress' power under the Commerce Clause.

■ Wilson asserts that even though the jurisdictional element is present, *Lopez* requires that a statute must specify a "substantial affect" on interstate commerce in order to be constitutional. This argument has been considered and rejected in the context of § 922(g)(1). In *Scarborough v. United States,* 431 U.S. 563, 577, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977), the Supreme Court held that under 18 U.S.C.App. § 1202, the predecessor of § 922(g)(1), the Commerce Clause was satisfied as long as a "minimal nexus" to interstate commerce was shown. Accordingly, the government need only prove that the firearm in question moved in interstate com-

---

**2.** Congress enacted a new version of § 922(q) in 1996, addressing the flaws found by the Supreme

Court.

merce at any time to meet its burden of proving that it was used "in or affecting commerce." *Bell,* 70 F.3d at 498 (citing *United States v. Lowe,* 860 F.2d 1370, 1374 (7th Cir.1988), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1639, 104 L.Ed.2d 155 (1989)); *see also United States v. Chesney,* 86 F.3d 564, 571 (6th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 2470, 138 L.Ed.2d 225 (1996). The discussion in *Lopez* of the "substantially affects" standard did not "revis[e] the government's burden of proof on a jurisdictional element in criminal proceedings" and did not alter the fact that it need only meet the "minimal nexus" test enunciated in *Scarborough. United States v. Cardoza,* 129 F.3d 6, 11 (1st Cir.1997). Accordingly, under § 922(g)(1), the government need only prove "a prior movement of the firearm across state lines" to satisfy the jurisdictional element and the Commerce Clause. *United States v. Lewis,* 100 F.3d 49, 51–52 (7th Cir.1996). Since § 922(g)(1) and § 922(g)(8) share the same jurisdictional element, this analysis is equally applicable to the present case, and Wilson's argument accordingly fails.

While Wilson levels a number of other challenges under the Commerce Clause, most amount to policy arguments and are inappropriate for us to consider. None of his other arguments merit discussion. Since § 922(g)(8) requires the government to prove that the firearms at issue have at least a minimal nexus with interstate commerce, the statute was enacted within Congress' power under the Commerce Clause, and we find that it is constitutional.

## 2. Tenth Amendment

 Wilson next argues that § 922(g)(8) violates the Tenth Amendment, which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. In *New York v. United States,* the Supreme Court stated that "[i]f a power is delegated to Congress in the

Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." 505 U.S. 144, 156, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). Thus, the Tenth Amendment and Article I of the Constitution are complements to one another; when Congress acts pursuant to an enumerated power, there can be no violation of the Tenth Amendment. *Black,* 125 F.3d at 462 (citations omitted); *accord United States v. Mussari,* 95 F.3d 787, 791 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1567, 137 L.Ed.2d 712 (1997), and *United States v. Hampshire,* 95 F.3d 999, 1004 (10th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 753, 136 L.Ed.2d 690 (1997).

Wilson disagrees with our past reliance on *New York,* stating that the "blanket reading" we have given it is "simply wrong." Wilson notes that in *New York,* the Supreme Court invalidated a portion of the Low-Level Radioactive Waste Policy Amendments Act of 1985 because it was inconsistent with the Tenth Amendment. 505 U.S. at 174–77, 112 S.Ct. 2408. However, the Court in *New York* had to decide "the circumstances under which Congress may use the States as implements of regulation; that is, whether Congress may direct or otherwise motivate the States to regulate in a particular field or a particular way." *Id.* at 161, 112 S.Ct. 2408. The Court found that a provision under which states either had to regulate the disposal of nuclear waste according to the mandates of Congress or take title to such waste unconstitutional, because such actions would " 'commandeer' state governments into the service of federal regulatory purposes" and would thus be inconsistent with the Constitution's division of authority between federal and state governments. *Id.* at 175, 112 S.Ct. 2408. The present case, involving a federal criminal statute to be implemented by federal authorities, implicates no such concerns, and Wilson's argument is without merit.[3] Therefore,

---

**3.** Wilson also cited *Printz v. United States,* 521 U.S. 98, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), for the proposition that Congress can enact legislation pursuant to its Commerce Clause powers but still violate the Tenth Amendment. In *Printz,* the Court held that the portion of the Brady Act

since we have found that Congress acted within its Commerce Clause power when it enacted § 922(g)(8), there is no Tenth Amendment violation in this case.

Wilson also asserts that § 922(g)(8) interferes with the ability of state judges to carry out their state's domestic relations laws, thus impermissibly regulating an area reserved for the states. In support of his argument, Wilson offers up a parade of hypothetical horribles that could ensue if the statute is allowed to stand. His arguments amount to policy concerns, which are for Congress to consider, not the courts. None of the examples offered by Wilson amounts to an unconstitutional infringement on the States' rights to regulate domestic relations, and Wilson has failed to demonstrate that § 922(g)(8) violates the Tenth Amendment.

### 3. Due Process

■ Lastly, Wilson argues that the statute is unconstitutional because it violates his due process rights under the Fifth Amendment. Citing *Bouie v. City of Columbia,* 378 U.S. 347, 350–51, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), for the proposition that a criminal statute, to be valid, must give fair warning of the conduct that it makes a crime, Wilson argues that he did not receive any warning that his possession of a weapon would lead to a federal prosecution. Wilson appears to have mistakenly combined two different lines of argument into one: whether a person knows that a law has been passed regulating certain conduct is a question separate and distinct from the question of whether that law, as written, adequately describes the conduct it seeks to criminalize. In any event, neither of Wilson's points is meritorious.

■ To the extent that Wilson is arguing that language used in § 922(g)(8) does not give adequate notice of the conduct it makes illegal, he is incorrect.

The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelli-

gence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.

*Bouie,* 378 U.S. at 351, 84 S.Ct. 1697 (quoting *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954)). A statute must be struck down when it is not "sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties." *Id.* (quoting *Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926)). An examination of the language of § 922(g)(8) shows that it does not suffer from any such deficiencies. It clearly specifies that individuals subject to certain types of protective orders may not ship or transport firearms or ammunition in or affecting commerce. The class of affected individuals is explicitly defined, as is the conduct sought to be regulated, and the statute is not unconstitutionally vague.

■ To the extent that Wilson is arguing that he was unaware of the law and that his conviction therefore cannot stand, he is also incorrect. The traditional rule in American jurisprudence is that ignorance of the law is no defense to a criminal prosecution. *Cheek v. United States,* 498 U.S. 192, 199, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991) (citations omitted); *see also Bryan v. United States,* —— U.S. ——, 118 S.Ct. 1939, 1947, 141 L.Ed.2d 197 (1998) (traditional rule is that "ignorance of the law is no excuse"); *Lambert v. People of the State of California,* 355 U.S. 225, 228, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957) (rule that "ignorance of the law will not excuse" is deeply rooted in American law). Wilson has not shown that the present statute falls into an exception to this general rule, *see Bryan,* —— U.S. at ——, 118 S.Ct. at 1947 (noting exception for "highly technical statutes that present[ ] the danger of ensnaring individuals engaged in apparently innocent conduct"), and *Lambert,* 355 U.S. at 228, 78 S.Ct. 240

requiring local law enforcement officials to conduct background checks before an individual could purchase a firearm was unconstitutional. The Court followed its decision in *New York,* concluding that the federal government cannot

command the States' officers to administer or enforce federal regulatory programs. 117 S.Ct. at 2384. As with *New York,* the present case is distinguishable and Wilson's citation to *Printz* is of no avail.

(notice required when penalty may be exacted for failing to act), and the fact that he was unaware of the existence of § 922(g)(8) does not render his conviction erroneous.

■ Lastly, Wilson alleges that because he had no notice of § 922(g)(8), he was unable to form the requisite mens rea to violate the statute. He then cites *Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), arguing that the elimination of a mens rea requirement in a criminal statute is a fundamental departure from longstanding principles of criminal law. *See* Appellant's Brief at 23. Being unable to form the mens rea required by a statute and being charged under a statute that has no mens rea requirement, however, are not one and the same. To the extent that Wilson is suggesting that § 922(g)(8) requires no particular mens rea for its violation, he is incorrect. Pursuant to 18 U.S.C. § 924(a)(2), an individual may only be punished if he "knowingly" violates any provision of § 922(g). This is in contrast to the statute involved in *Staples*, which contained no specific mens rea requirement but simply provided that it was "unlawful" to receive or possess certain types of firearms unless they were registered with the government. *Staples*, 511 U.S. at 605, 114 S.Ct. 1793. Since § 924(g)(8) does require a specific state of mind, Wilson's reliance on *Staples* is misplaced.

Furthermore, the fact that he did not know about the statute does not mean that he could not have committed a "knowing" violation of it. The Supreme Court has stated that "the term 'knowingly' does not necessarily have any reference to a culpable state of mind or to knowledge of the law." *Bryan*, 118 S.Ct. at 1945. Rather, "the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law." *Id.* (quoting *Boyce Motor Lines v. United States*, 342 U.S. 337, 345, 72 S.Ct. 329, 96 L.Ed. 367 (1952) (Jackson, J., dissenting)). Unless the text of the statute at issue dictates a different result, establishing a "knowing" violation of the statute only requires proof of knowledge by the defendant of the facts that constitute the offense. *Id.* at 1945. This understanding has been applied to those portions of § 922 that punish "knowing" conduct, including § 922(g). *Bryan*, 118 S.Ct. at 1945–46; *United States v. Ladell*, 127 F.3d 622, 624–25 (7th Cir.1997) (citations omitted). Wilson has not argued, nor do we find that he could, that the text of § 922(g)(8) requires a different meaning to be ascribed to "knowing," and he has not argued that he did not have knowledge of the actions constituting the offense (i.e., that he was possessing a gun in his car and was subject to an order of protection). Wilson's lack of knowledge of the existence of the statute is therefore immaterial and his due process rights were not violated in this case.

In summary, we find that § 922(g)(8) is a valid exercise of Congress' power under the Commerce Clause and does not violate either the Tenth Amendment or the due process clause of the Fifth Amendment. However, Wilson also challenges several other rulings of the district court, to which we now turn.

## II. Denial of Defendant's Motions for Judgment of Acquittal

■ After the government had presented its evidence, and again after Wilson had presented his, defense counsel moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(a). The district court denied both of these motions. On appeal, Wilson asserts that the district court's decisions were erroneous because the hearing he was given on September 1, 1995, did not meet the requirements of the Due Process Clause. The Supreme Court has consistently held that "some form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). To meet due process requirements, this hearing must afford an opportunity to be heard "at a meaningful time and in a meaningful manner." *Id.* (citing *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). "This requirement generally means that a party must have the opportunity for a hearing before the government initially interferes with the party's protected property interest." *Schmit v. ITT Federal Elec. Int'l*, 986 F.2d 1103, 1107 (7th Cir.1993) (quoting *Abbott v. Louisiana Ins. Guaranty*

*Ass'n,* 889 F.2d 626, 631 (5th Cir.1989), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1813, 108 L.Ed.2d 944 (1990)). The district court correctly denied Wilson's motions because, as the evidence presented at trial illustrates, the hearing afforded Wilson comports with due process requirements.

■ First, it is unquestioned that Wilson had notice of the hearing that took place on September 1, 1995. The government presented evidence that a copy of the emergency order of protection was personally served on Wilson by a deputy Crawford County sheriff. *See* Trial Tr. Day 2 at 110. This order contained notice that another hearing would be held on September 1, 1995, at 1:00 p.m., *see* Trial Tr. Day 1 at 66, and Wilson was present in court on that day and time. Second, the hearing was held at a meaningful time. As noted above, a hearing at a "meaningful time" generally means one held before someone is separated from their property (or, in this case, liberty). While Wilson attempted to raise doubt about whether the hearing on September 1 concerned the plenary order of protection, the government put on evidence indicating that it was and that it took place before the order was entered.

■ Finally, we also agree with the district court that Wilson had an opportunity to participate in a "meaningful manner" at the hearing. An opportunity to respond is afforded when a party has "the opportunity to present reasons, either in person or in writing, why proposed action should not be taken...." *Cleveland Board of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Wilson was afforded this opportunity at the hearing. According to both Thomas and Judge Correll, the protective order was explained to Wilson and he was asked if he could live by those terms. While Wilson indicated that he could and the order was entered, he could also have told the judge that he disagreed with the order and given his reasons therefor. The record indicates that Wilson, although proceeding *pro se* at the time, had successfully persuaded another judge to vacate a default divorce that had been entered and then recuse himself from the case. Wilson was thus competent to lodge an objection to the protective

order, and he was given the ability to do so. This is all that due process requires, and the district court correctly found that Wilson was not entitled to a judgment of acquittal.

## III. Evidentiary Ruling

■ Wilson next argues that the district court erred in failing to admit Defendant's Exhibit 6 at trial. We examine the decision of the district court to admit or exclude evidence for an abuse of discretion. *Kelly v. Municipal Courts of Marion County, Indiana,* 97 F.3d 902, 912–13 (7th Cir. 1996). Accordingly, our inquiry is not whether we would have ruled the same way but rather whether any reasonable person would agree with the trial court. *Holmes v. Elgin, Joliet & Eastern Railway Co.,* 18 F.3d 1393, 1397 (7th Cir.1994). Even if we find that an error was made, reversal is only appropriate if the error caused some harm to the case. *Id.*

■ The exhibit in question is a bill from Thomas for legal work performed on behalf of Wilson's ex-wife during their divorce proceedings. When the exhibit was offered at trial, the prosecution objected to its admission on the basis of relevance. *See* Trial Tr., Day 2 at 67. The court sustained the objection, finding that the exhibit would "confuse the jury" and would not "add[ ] anything" to the evidence already presented. *Id.* at 73. Under Fed.R.Evid. 403, the court may exclude relevant evidence whose probative value is substantially outweighed by the danger of its confusing the issues. The district court's balancing of probative value versus prejudice is a "highly discretionary function which is afforded great deference by this Court." *United States v. Adames,* 56 F.3d 737, 746 (7th Cir.1995), *cert. denied,* 517 U.S. 1250, 116 S.Ct. 2512, 135 L.Ed.2d 201 (1996). Given our deferential standard of review, we cannot say that the district court committed any error by refusing to admit Defendant's Exhibit 6.

The exhibit reflects that Thomas billed Angela Wilson for the following: "9/01/95 Hearing on motion to vacate; Hearing on extension of order of protection ... 9/15/95 Meeting; Reset case; Get order of protec-

tion entered; Notice of Hearing." *See* Appellant's Brief App. C. Defense counsel argued to the district court, in essence, that the bill should be admitted because it showed that the hearing on September 1 was for the purpose of extending the emergency order of protection already entered against Wilson and did not concern the plenary order of protection entered on September 15. In response, the government pointed out that Thomas had testified that the bill was sent by his office, not by himself personally, and that nothing showed that the invoice represented an exhaustive account of every action Thomas took on Angela Wilson's behalf. Additionally, Thomas testified that he "probably didn't look at it before it was sent," and acknowledged only that it represented work that he had performed for Angela Wilson. *See* Trial Tr., Day 2 at 67. This testimony supports the district court's conclusion that the exhibit was of little probative value and would confuse the jury, and we cannot find that this conclusion constitutes an abuse of discretion.

## IV. Jury Instructions

■ Wilson also takes issue with the district court's refusal to give two of his tendered instructions to the jury. The first instruction read as follows:

> One of the elements the Government has to prove beyond a reasonable doubt is that Defendant had a hearing before the plenary order of protection was entered. The law requires that a hearing includes [sic] a defendant's right to be heard at a meaningful time and in a meaningful manner.

*See* Appellant's Brief, App. F. Similarly, Wilson's second proposed instruction stated:

> One of the elements the Government has to prove beyond a reasonable doubt is that Defendant had an opportunity to participate at a hearing before the plenary order of protection was entered. The law requires that an opportunity to participate at a hearing includes the defendant's right to a fair and meaningful opportunity to present his defense.

■ *See id.,* App. G. The court refused to give these instructions, finding that they were confusing and would not help the jury

resolve any of the issues before it. We review a district court's decisions regarding jury instructions for an abuse of discretion. *American Nat'l Bank & Trust Co. of Chicago v. Regional Transp. Auth.,* 125 F.3d 420, 434 (7th Cir.1997) (citation omitted). We find no abuse of discretion here.

■ A defendant is entitled to a jury instruction on his theory of defense only if: 1) the instruction represents an accurate statement of the law; 2) the instruction reflects a theory that is supported by the evidence; 3) the instruction reflects a theory that is not already part of the charge; and 4) failure to include the instruction would deny the defendant a fair trial. *United States v. Edwards,* 36 F.3d 639, 645 (7th Cir.1994) (citing *United States v. Boykins,* 9 F.3d 1278, 1285 (7th Cir.1993)). For a conviction under § 922(g)(8), one of the elements that the government must prove beyond a reasonable doubt is that the protective order was issued against the defendant "after a hearing of which such person received actual notice, and at which such person had an opportunity to participate." § 922(g)(8)(A). These very elements were part of the charge to the jury in an instruction detailing what the government had to prove in order for it to find Wilson guilty. Wilson's proposed instructions essentially repeated these elements; as such, they did not meet criteria (3) above and the district court correctly refused to give them.

Wilson also argues that his instructions should have been given because the terms "hearing" and "opportunity to participate" were not otherwise defined in the instructions. We, just as the district court, disagree that these terms needed any definitions beyond their common-sense meanings. The instructions given to the jury tracked the language of § 922(g)(8), including as elements of the crime: "4. The Order of Protection was issued after a hearing of which defendant received actual notice; 5. Defendant had an opportunity to participate at said hearing...." *See* Loose Pleadings, Vol. I. It is axiomatic that when construing a statute, we must first look to the language used by Congress, giving the words their ordinary meaning. "[A]bsent a clearly expressed legislative

intention to the contrary, that language must ordinarily be regarded as conclusive." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982).

A court in the District of Connecticut has taken this approach to § 922(g)(8), applying these definitions:

> Webster's New International Dictionary defines "opportunity" as "a time or place favorable for executing a purpose" and then further explicates that the word "opportunity," "... often implies little more than a possibility or chance of giving rise to some result." The same dictionary defines "participate" as "[t]o have a share in common with others; to partake...." From these dictionary definitions the plain meaning of the phrase "opportunity to participate" can be construed as a possibility or chance to partake or share.

*United States v. Falzone,* 1998 WL 351471 (D.Conn.1998). Additionally, Webster's Collegiate Dictionary defines "hearing" as "an opportunity to be heard, to present one's side of a case, or to be generally known or appreciated." WEBSTER'S COLLEGIATE DICTIONARY 535 (10th ed.1996). The terms "hearing" and "opportunity to participate" are not arcane legal terms that the general public does not understand, and we do not believe that any special attention had to be given to them in the jury instructions. The definitions found in the dictionary adequately describe these terms for purposes of the jury's deliberations, and we believe that the jury would have understood the terms to have these common meanings. Accordingly, the district court did not err by refusing to tender Wilson's proposed instructions to the jury.

**V. Sentencing Issue**

▮▮▮▮ Wilson also alleges that the district court erred in determining his sentence. We review a district court's findings of fact for sentencing purposes for clear error. While we also give due deference to the court's application of the Sentencing Guidelines to the facts of the case, we review questions of law involving interpretation of a Guideline provision *de novo. United States v. Purchess,* 107 F.3d 1261, 1265–66 (7th

Cir.1997) (citing *United States v. Hammick,* 36 F.3d 594, 597 (7th Cir.1994)).

The district court determined that Wilson's offense level was 21 and his criminal history category was II, yielding an applicable sentencing range of 41 to 51 months in prison. Wilson was sentenced to 41 months' imprisonment, the bottom end of the Guideline range. *See* Sentencing Tr. at 32 and 47–48. Wilson claims that the court should have given him a two-level reduction in his offense level pursuant to United States Sentencing Guideline ("U.S.S.G.") § 3E1.1(a). This Guideline directs the district court to reduce the defendant's offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense...." U.S.S.G. § 3E1.1(a). Application Note 2 provides the following guidance to applying this rule:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

Wilson asserts that he fits within the boundaries of the application note—while he went to trial, he was challenging the constitutionality of the statute, not his factual guilt—and should have received a downward departure. After reviewing the transcript of the sentencing hearing, we find that the district court did not abuse its discretion in denying Wilson's request.

The district court correctly interpreted § 3E1.1, noting that a defendant can go to

trial and still receive a downward departure for acceptance of responsibility. *See* Sentencing Tr. at 31. The court then found that Wilson had not demonstrated that he accepted responsibility for his acts, a conclusion amply supported by the evidence. While he stipulated to many facts, Wilson did more than merely question the constitutionality of § 922(g)(8) at trial. For example, he attempted to challenge the testimony of Judge Correll and William Thomas regarding what occurred and what was discussed at the hearing on September 1, 1995. This was a factual challenge, not purely a constitutional one. Additionally, Wilson's own statements indicate that he did not accept responsibility for his actions. Some examples: 1) after the jury had been polled regarding its verdict, Wilson said "You all made a terrible mistake. I forgive you." (Trial Tr., Day 3 at 20; Sentencing Tr. at 2425); 2) at the sentencing hearing, Wilson told the Court that "I know I've been railroaded." (Sentencing Tr. at 18); and 3) later in the sentencing hearing, Wilson said that "I have the transcripts of what [Angela Wilson] testified to and I'll show later on the words were put into her mouth." (Sentencing Tr. at 35). These statements, and others, support the district court's finding that Wilson did not accept responsibility for his actions. The court was within its discretion in finding that Wilson was not entitled to a downward adjustment under U.S.S.G. § 3E1.1 and his sentence must stand.

## CONCLUSION

Because Congress acted within its enumerated powers when it enacted 18 U.S.C. § 922(g)(8) and the statute does not run afoul of the Fifth or Tenth Amendments, Wilson's constitutional challenge must fail. The district court also properly denied Wilson's motion for acquittal and determined that Defendant's Exhibit 6 was inadmissible and that Wilson's proposed jury instructions should not be tendered. Finally, no basis exists in this case for a downward departure pursuant to U.S.S.G. § 3E1.1. Accordingly, Wilson's conviction and sentence are AFFIRMED.

POSNER, Chief Judge, dissenting.

It is wrong to convict a person of a crime if he had no reason to believe that the act for which he was convicted *was* a crime, or even that it was wrongful. This is one of the bedrock principles of American law. It lies at the heart of any civilized system of law. Yet like most legal generalizations, it can be maintained only with careful qualification. We generally do not require prosecutors to prove that the defendant *knew* that he was violating the law, even in cases in which the law is sufficiently remote from the moral code of the society that such knowledge cannot be presumed or its absence taken as evidence of culpable moral obtuseness. We say instead that "ignorance of the law is no defense," and do not pause to consider the consistency of this maxim with what we elsewhere affirm to be a fundamental constituent of the rule of law and the Constitution of the United States. In the unusual circumstances of this case, the maxim of expedience should yield to the bedrock principle; and there is enough room in the statutory language to achieve this end without having to trundle out the heavy artillery of constitutional law.

Congress created, and the Department of Justice sprang, a trap on Carlton Wilson as a result of which he will serve more than three years in federal prison for an act (actually an omission to act) that he could not have suspected was a crime or even a civil wrong. We can release him from the trap by interpreting the statute under which he was convicted to require the government to prove that the violator knew that he was committing a crime. This is the standard device by which the courts avoid having to explore the outer boundaries of the constitutional requirement of fair notice of potential criminal liability. See, e.g., *Ratzlaf v. United States,* 510 U.S. 135, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994); *Staples v. United States,* 511 U.S. 600, 618–19, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994).

Section 922(g)(8) of the federal criminal code (Title 18), when read in conjunction with section 924(a)(2), makes it a crime punishable by up to 10 years in prison for any person to possess a gun if he is subject to a domestic-relations restraining order against stalking

or otherwise threatening a spouse or child. The first of these sections, 18 U.S.C. § 922(g)(8), contains no reference to the defendant's knowledge. But this section merely makes the conduct (the possession of a gun by a person subject to a stalking order) unlawful; it imposes no penalty for a violation. The penalty provision is section 924(a)(2), and it requires that the defendant have "knowingly" violated section 922(g).

The stalking provision was enacted in 1994 and the number of prosecutions for violating it has been minuscule (perhaps fewer than 10, though I have not been able to discover the exact number, which is not a reported statistic) in relation to the probable number of violations. I estimate that every year the law has been in effect almost one hundred *thousand* restraining orders against domestic violence have been issued (estimated from Patricia Tjaden & Nancy Thoenes, *Stalking in America: Findings From the National Violence Against Women Survey* 3, 6, 12 (U.S. Dept. of Justice, April 1998); Adele Harrell & Barbara E. Smith, "Effects of Restraining Orders on Domestic Violence Victims," in *Do Arrests and Restraining Orders Work?* 219 (Eve S. Buzawa & Carl G. Buzawa eds.1996)). Since 40 percent of U.S. households own guns (U.S. Dept. of Justice, Bureau of Justice Statistics, *Sourcebook of Criminal Justice Statistics 1996* 167 (1997)), there can be very little doubt that a large percentage of those orders were issued against gun owners.

How many of these gun owners, when they got notice of the restraining order, dispossessed themselves of their guns? I doubt that any did. The law is *malum prohibitum,* not *malum in se;* that is, it is not the kind of law that a lay person would intuit existed because the conduct it forbade was contrary to the moral code of his society. Compare *United States v. Robinson,* 137 F.3d 652, 654 (1st Cir.1998) ("child pornography offends the moral sensibility of the community at large"), with *United States v. Grigsby,* 111 F.3d 806, 816–21 (11th Cir.1997) (importation of ivory in violation of the African Elephant Conservation Act not criminal without knowledge of the Act). Yet the Department of Justice took no steps to publicize the existence of the law until long after Wilson violated it, even to the extent of advising the state judiciaries of it so that judges could warn defendants in domestic-relations disputes. At argument the prosecutor told us that the Office of the U.S. Attorney for the Southern District of Illinois has made no effort to advise the local judiciary of the law. Later he sent us two bulletins from Department of Justice headquarters in Washington to the U.S. Attorneys' Offices throughout the country directing the U.S. Attorneys to "educate your state and local counterparts on these provisions. Their assistance, *particularly in working with local judges to fashion domestic violence protective orders,* is essential to the effective implementation of the [provisions]" (emphasis added). But these bulletins—a tacit admission that four years after the enactment of the law, the word hadn't gotten out even to judges—were not circulated until after Wilson's trial.

The federal criminal code contains thousands of separate prohibitions, many ridiculously obscure, such as the one against using the coat of arms of Switzerland in advertising, 18 U.S.C. § 708, or using "Johnny Horizon" as a trade name without the authorization of the Department of the Interior. 18 U.S.C. § 714. The prohibition in section 922(g)(8) is one of the most obscure. A person owns a hunting rifle. He knows or should know that if he is convicted of a felony he will have to get rid of the gun; if he doesn't know, the judge or the probation service will tell him. But should he be made subject to a restraining order telling him to keep away from his ex-wife, whom he has *not* ever threatened with his hunting rifle (the judge who issued the restraining order could but did not issue an order forbidding Wilson to possess a firearm as long as the order was in force, 725 ILCA 5/112A–14(b)(14.5)), it will not occur to him that he must give up the gun unless the judge issuing the order tells him. The judge didn't tell Wilson; so far as appears, the judge was unaware of the law. Wilson's lawyer didn't tell him either—Wilson didn't have a lawyer. No one told him. And there is no reason that he should have guessed, for while he had beaten his wife and threatened to kill her, there is no indication that guns played any part in the beating or

the threats. The fact that the restraining order contained no reference to guns may have lulled him into thinking that, as long as he complied with the order and stayed away from his wife, he could carry on as before.

When a defendant is morally culpable for failing to know or guess that he is violating *some* law (as would be the case of someone who committed a burglary without thinking—so warped was his moral sense—that burglary might be a crime), we rely on conscience to provide all the notice that is required. Sometimes the existence of the law is common knowledge, as in the case of laws forbidding people to own hand grenades (see *United States v. Freed*, 401 U.S. 601, 609, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971)), forbidding convicted felons to own any firearms, and requiring a license to carry a handgun. And sometimes, though the law is obscure to the population at large and nonintuitive, the defendant had a reasonable opportunity to learn about it, as in the case of persons engaged in the shipment of pharmaceuticals who run afoul of the criminal prohibitions in the federal food and drug laws. See *United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943). We want people to familiarize themselves with the laws bearing on their activities. But a reasonable opportunity doesn't mean being able to go to the local law library and read Title 18. It would be preposterous to suppose that someone from Wilson's milieu is able to take advantage of such an opportunity. If none of the conditions that make it reasonable to dispense with proof of knowledge of the law is present, then to intone "ignorance of the law is no defense" is to condone a violation of fundamental principles for the sake of a modest economy in the administration of criminal justice.

Actually a false economy. The purpose of criminal laws is to bring about compliance with desired norms of behavior. In the present case it is to reduce domestic violence by getting guns out of the hands of people who are behaving menacingly toward (in the usual case) an estranged or former spouse. H. Conf. Rep. No. 711, 103d Cong, 2d Sess. 391 (1994), U.S. Code Cong. & Admin. News at 1839, 1859. This purpose is ill served by keeping the law a secret, which has been the practical upshot of the Department of Justice's failure—until too late, at least for Wilson—either to enforce the law vigorously or to notify the relevant state officials of the law's existence. In such circumstances the law is not a deterrent. It is a trap.

All the Department of Justice had to do in order to preserve the rule of law was to notify all state courts that have a domestic-relations jurisdiction of the existence and terms of 18 U.S.C. § 922(g)(8) and to suggest that every domestic-relations restraining order contain a printed warning that the defendant is violating federal criminal law unless he immediately divests himself of any firearms and ammunition that he owns. Domestic-relations judges would be happy to include such a warning because it would give added teeth to their orders. At slight cost—negative, really, when one considers how compliance with the law would soar—the administration of the law would be brought into conformity with the rule of law. The bulletins that the home office of the Department of Justice has sent the U.S. Attorneys is a belated but welcome recognition of my point but came too late to help Wilson avoid becoming a federal felon.

We thus have an example of those "highly technical statutes that present ... the danger of ensnaring individuals engaged in apparently innocent conduct" of which the Supreme Court spoke in *Bryan v. United States*, —— U.S. ——, 118 S.Ct. 1939, 1946–47, 141 L.Ed.2d 197 (1998). This case differs from *Bryan* because the statute here is easy to understand; but it is hard to discover, and that comes to the same thing, as we know from *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). The law challenged in that case required a felon to register with the police. Lambert, a felon, failed to do so. She "had no actual knowledge of the requirement"; there was no showing of "the probability of such knowledge"; "violation of [the law's] provisions [was] unaccompanied by any activity whatever"; and "circumstances which might move one to inquire as to the necessity of registration [were] completely lacking." *Id.* at 227–29, 78 S.Ct. 240. The Court voided Lam-

bert's conviction. We should do the same for Wilson's conviction.

*Bryan's* reference to "apparently innocent conduct" describes the ownership of rifles and handguns, for personal use and not for sale, by nonfelons in this nation's gun-friendly culture. "[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country." *Staples v. United States, supra,* 511 U.S. at 610, 114 S.Ct. 1793. Such ownership is as innocent as making huge cash deposits, or having a large professional income but not filing income tax returns—activities that the Supreme Court has held do not subject a person to criminal liability if he is ignorant of the law. *Ratzlaf v. United States, supra; Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991); see also *Liparota v. United States,* 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985); *United States v. Curran,* 20 F.3d 560, 569–71 (3d Cir.1994).

It is true that strict liability, of which convicting a person for conduct that he could not, realistically, have known was criminal is an example, is not unknown to the criminal law. There are strict-liability crimes, see, e.g., *United States v. Park,* 421 U.S. 658, 670–73, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975); *United States v. Balint,* 258 U.S. 250, 252–53, 42 S.Ct. 301, 66 L.Ed. 604 (1922); *United States v. Dotterweich, supra; Mueller v. Sullivan,* 141 F.3d 1232, 1235–36 (7th Cir.1998), which is to say crimes that can be committed without any culpable state of mind whatever. And many crimes have an element of strict liability, the classic example being statutory rape in jurisdictions in which the girl's apparent maturity is not a defense. See, e.g., *State v. Yanez,* 716 A.2d 759 (R.I.1998); Richard A. Posner and Katharine B. Silbaugh, *A Guide to America's Sex Laws,* ch. 3 (1996). But the existence and content of the criminal prohibition in these cases are not hidden; the defendant is warned to steer well clear of the core of the offense (as in the statutory-rape case; and see *United States v. Anton,* 683 F.2d 1011, 1019–20 (7th Cir.1982) (dissenting opinion)), or to take the utmost care (the food and drug cases), or to familiarize himself with the laws relating to his business (emphasized in *Mueller*). None of these

rationales applies to Wilson. His is the classic case of the unwarned defendant. He is entitled to a new trial at which the government would have to prove that he knew that continued possession of guns after the restraining order was entered was a crime. This conclusion is a linguistically permissible interpretation of the statute because only the *knowing* violation of section 922(g)(8) carries a criminal penalty; the interpretation avoids a constitutional issue; and it is supported by *Lambert, Ratzlaf, Cheek,* and other decisions.

I agree with my colleagues' discussion of the other issues that the appeal presents.