**UNITED STATES of America**

v.

**Timothy Joe EMERSON.**

**No. CR. A. 6:98CR103C.**

United States District Court,
N.D. Texas,
San Angelo Division.

April 7, 1999.

William B. Mateja, Assistant United States Attorney, Lubbock, TX, for plaintiff.

David Michael Guinn, Assistant Federal Public Defender, Lubbock, TX, for defendant.

## AMENDED MEMORANDUM OPINION[1]

CUMMINGS, District Judge.

Defendant Timothy Joe Emerson ("Emerson") moves to dismiss the Indictment against him, claiming that the statute he is prosecuted under, 18 U.S.C. § 922(g)(8), is an unconstitutional exercise of congressional power under the Commerce Clause and the Second, Fifth, and Tenth Amendments to the United States Constitution. For the reasons stated below, the Court **GRANTS** Emerson's Motion to Dismiss.

### I.

### BACKGROUND

On August 28, 1998, Emerson's wife, Sacha, filed a petition for divorce and ap-

---

1. On February 26, 1999, the Court granted Defendant's Motion to Dismiss. The following is the Court's memorandum opinion of the Order.

plication for a temporary restraining order in the 119th District Court of Tom Green County, Texas. The petition stated no factual basis for relief other than the necessary recitals required under the Texas Family Code regarding domicile, service of process, dates of marriage and separation, and the "insupportability" of the marriage. The application for a temporary restraining order—essentially a form order frequently used in Texas divorce procedure—sought to enjoin Emerson from engaging in various financial transactions to maintain the financial status quo and from making threatening communications or actual attacks upon his wife during the pendency of the divorce proceedings.

On September 4, 1998, the Honorable John E. Sutton held a hearing on Mrs. Emerson's application for a temporary restraining order. Mrs. Emerson was represented by an attorney at that hearing, and Mr. Emerson appeared *pro se.* Mrs. Emerson testified about her economic situation, her needs in the way of temporary spousal support and child support, and her desires regarding temporary conservatorship of their minor child.

During the hearing, Mrs. Emerson alleged that her husband threatened over the telephone to kill the man with whom Mrs. Emerson had been having an adulterous affair. However, no evidence was adduced concerning any acts of violence or threatened violence by Mr. Emerson against any member of his family, and the district court made no findings to that effect. Furthermore, the court did not admonish Mr. Emerson that if he granted the temporary restraining order, Mr. Emerson would be subject to federal criminal prosecution merely for possessing a firearm while being subject to the order.

## II.

## ANALYSIS

As stated above, Emerson was indicted for possession of a firearm while being under a restraining order, in violation of 18 U.S.C. § 922(g)(8) ("the Act"). This statute states that:

> (g) It shall be unlawful for any person—
>
> (8) who is subject to a court order that—
>
> (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
>
> (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
>
> (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
>
> (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury. . . .

18 U.S.C. § 922(g)(8).

Emerson argues that 18 U.S.C. § 922(g)(8) is an unconstitutional exercise of congressional power under the Commerce Clause and the Second, Fifth, and Tenth Amendments to the United States Constitution. The Court will address these arguments *seriatim.*

### A.

### Commerce Clause

■ Emerson first argues that 18 U.S.C. § 922(g)(8) is an unconstitutional exercise of congressional power under the Commerce Clause of the United States Constitution. U.S. CONST. art. I, § 8, cl. 3. Pursuant to the Supreme Court's holding in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Emerson argues that the Act is unconsti-

tutional because it does not regulate commercial activity.

However, the Fifth Circuit Court of Appeals has examined the validity of 18 U.S.C. § 922(g)(8) under a Commerce Clause challenge and has held that the Act is constitutional. *United States v. Pierson*, 139 F.3d 501 (5th Cir.1998). Accordingly, Emerson cannot sustain a Motion to Dismiss under a Commerce Clause challenge.

## B.

### Second Amendment

Emerson claims that 18 U.S.C. § 922(g)(8) violates his rights under the Second Amendment to the United States Constitution. The Second Amendment states that:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. CONST. amend. II.

Only if the Second Amendment guarantees Emerson a personal right to bear arms can he claim a constitutional violation. Whether the Second Amendment recognizes an individual right to keep and bear arms is an issue of first impression within the Fifth Circuit. Emerson claims that he has a personal right to bear arms which the Act infringes, while at oral argument on the Motion to Dismiss, the Government claimed it is "well settled" that the Second Amendment creates a right held by the States and does not protect an individual right to bear arms.

### 1.

### Second Amendment Schools of Thought

Two main schools of thought have developed on the issue of whether the Second Amendment recognizes individual or collective rights. These schools of thought are referred to as the "states' rights," or "collective rights," school and the "individual rights" school. The former group cites the opening phrase of the amendment, along with subsequent case law, as authority for the idea that the right only allows states to establish and maintain militias, and in no way creates or protects an individual right to own arms. David E. Johnson, Note, *Taking a Second Look at the Second Amendment and Modern Gun Control Laws*, 86 KY.L.J. 197, 198 (1997–98) (citing Andrew D. Herz, *Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic Responsibility*, 75 B.U.L.REV. 57 (1995)). Due to changes in the political climate over the last two centuries and the rise of National Guard organizations among the states, states' rights theorists argue that the Second Amendment is an anachronism, and that there is no longer a need to protect any right to private gun ownership.

The individual rights theorists, supporting what has become known in the academic literature as the "Standard Model," argue that the amendment protects an individual right inherent in the concept of ordered liberty, and resist any attempt to circumscribe such a right. *Id.* (citing Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 TENN.L.REV. 461, 464–88 (1995); Robert Dowlut, *The Right to Keep and Bear Arms: A Right to Self-Defense Against Criminals and Despots*, 8 STAN.L. & POL'Y REV. 25 (1997)).

### 2.

### Textual Analysis

A textual analysis of the Second Amendment supports an individual right to bear arms. A distinguishing characteristic of the Second Amendment is the inclusion of an opening clause or preamble, which sets out its purpose. No similar clause is found in any other amendment. Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L.J. 637, 644 (1989). While states' rights theorists seize upon this first clause to the exclusion of the second, both clauses should be read *in pari materia*, to give effect and harmonize both clauses,

rather than construe them as being mutually exclusive.

The amendment reads "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Within the amendment are two distinct clauses, the first subordinate and the second independent. If the amendment consisted solely of its independent clause, "the right of the people to keep and bear Arms, shall not be infringed," then there would be no question whether the right is individual in nature. David E. Johnson, Note, *Taking a Second Look at the Second Amendment and Modern Gun Control Laws*, 86 KY. L.J. 197, 200 (1997–98).

Collective rights theorists argue that addition of the subordinate clause qualifies the rest of the amendment by placing a limitation on the people's right to bear arms. *Id.* However, if the amendment truly meant what collective rights advocates propose, then the text would read "[a] well regulated Militia, being necessary to the security of a free State, the right of the *States* to keep and bear Arms, shall not be infringed." However, that is not what the framers of the amendment drafted. The plain language of the amendment, without attenuate inferences therefrom, shows that the function of the subordinate clause was not to qualify the right, but instead to show why it must be protected. *Id.* The right exists independent of the existence of the militia. If this right were not protected, the existence of the militia, and consequently the security of the state, would be jeopardized. *Id.* at 201.

The Supreme Court recently interpreted the text of the Second Amendment and noted that the phrase "the people" in the Second Amendment has the same meaning in both the Preamble to the Constitution and in the First, Fourth, Fifth, and Ninth Amendments. *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). The Court held that the phrase "the people" "seems to have been a term of art employed in select parts of the Constitution."

The Second Amendment protects "the right of the people to keep and bear Arms," and the Ninth and Tenth Amendments provide that certain rights and powers are retained by and reserved to "the people."

\*  \*  \*  \*  \*  \*

While this textual exegesis is by no means conclusive, it suggests that "the people" protected by the Fourth Amendment, and by the First and Second Amendments, ... refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community. *See United States ex rel. Turner v. Williams*, 194 U.S. 279, 292, 24 S.Ct. 719, 48 L.Ed. 979 (1904).

The Court has also held that given their contemporaneous proposal and passage, the amendments of the Bill of Rights should be read *in pari materia*, and amendments which contain similar language should be construed similarly. *Patton v. United States*, 281 U.S. 276, 298, 50 S.Ct. 253, 74 L.Ed. 854 (1930), *cited by* David Harmer, *Securing a Free State: Why the Second Amendment Matters*, 1998 BYU L.REV. 55, 61 (1998). The Court's construction of "the people" as used in the Second Amendment supports a holding that the right to keep and bear arms is a personal right retained by the people, as opposed to a collective right held by the States. Thus, a textual analysis of the Second Amendment clearly declares a substantive right to bear arms recognized in the people of the United States.

### 3.

### Historical Analysis

"[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country." *Staples v. United States*, 511 U.S. 600, 610, 114 S.Ct.

1793, 128 L.Ed.2d 608 (1994). A historical examination of the right to bear arms, from English antecedents to the drafting of the Second Amendment, bears proof that the right to bear arms has consistently been, and should still be, construed as an individual right.

### a.

### English History

A review of English history explains the founders' intent in drafting the Second Amendment. As long ago as 690 A.D., Englishmen were required to possess arms and to serve in the military. David T. Hardy, *Armed Citizens, Citizen Armies: Toward a Jurisprudence of the Second Amendment*, 9 HARV.J.L. & PUB. POL'Y 559, 562 (1986) (citing 1 JOHN J. BAGLEY & PETER B. ROWLEY, A DOCUMENTARY HISTORY OF ENGLAND 1066–1540, at 152 (1965)). This obligation continued for centuries, requiring nobility, and later commoners, to keep arms and participate in the militia. *Id.* at 563–65. The obligation to keep arms was not simply to provide military service in the king's army; English citizens were also required to provide local police services, such as pursuing criminals and guarding their villages. CLAYTON E. CRAMER, FOR THE DEFENSE OF THEMSELVES AND THE STATE: THE ORIGINAL INTENT AND JUDICIAL INTERPRETATION OF THE RIGHT TO KEEP AND BEAR ARMS 24–25 (1994); JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS: THE ORIGINS OF AN ANGLO-AMERICAN RIGHT 2 (1994).

By the middle of the seventeenth century, however, the sovereign jeopardized the individual right to bear arms. Charles II, and later James II, began to disarm many of their Protestant subjects. Hardy, *supra*, at 574–79. James II was an unpopular king whose policies stirred great resentment among both the political and religious communities of England. David E. Murley, *Private Enforcement of the Social Contract: Deshaney and the Second Amendment Right to Own Firearms*, 36 DUQ.L.REV. 15, 19 (1997). Even-

tually, James II fled England during what was later termed the Glorious Revolution. Hardy, *supra*, at 579. In the aftermath of the Glorious Revolution, Parliament passed the English Bill of Rights in 1689, codifying the individual right to bear arms. *Id.* at 580. The Bill of Rights provided that "the subjects which are Protestant may have arms for their defense suitable to their conditions and as allowed by law." *Id.* at 581.

### b.

### The Colonial Right To Bear Arms

The American colonists exercised their right to bear arms under the English Bill of Rights. Indeed, the English government's success in luring Englishmen to America was due in part to pledges that the immigrants and their children would continue to possess "all the rights of natural subjects, as if born and abiding in England." MALCOLM, *supra*, at 138. As in England, the colonial militia played primarily a defensive role, with armies of volunteers organized whenever a campaign was necessary. *Id.* at 139. Statutes in effect bore evidence of an individual right to bear arms during colonial times. For example, a 1640 Virginia statute required "all masters of families" to furnish themselves and "all those of their families which shall be capable of arms . . . with arms both offensive and defensive." *Id.* (citing THE OLD DOMINION IN THE SEVENTEENTH CENTURY: A DOCUMENTARY HISTORY OF VIRGINIA, 1606–1689, at 172 (Warren M. Billings ed., 1975)). A 1631 Virginia law required "all men that are fittinge to beare armes, shall bring their pieces to church . . . for drill and target practice." Hardy, *supra*, at 588 (quoting 1 WILLIAM W. HENING, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE IN THE YEAR 1619, at 173–74 (reprint.1969) (1823)). These laws served the twofold purpose of providing individual self-defense while giving England a reserve force available in time of war. Murley, *supra*, at 20.

Following the French and Indian War, England increased taxes and stationed a large army in the colonies. On April 3, 1769, the *Boston Evening Post* announced that colonial authorities urged the citizenry to take up arms. In reply to the claim that this request was unlawful, the newspaper observed that:

> It is certainly beyond human art and sophistry, to prove the British subjects, to whom the *privilege* of possessing arms as expressly recognized by the Bill of Rights, and who live in a province where the law requires them to be equipped with *arms,* are guilty of an *illegal act,* in calling upon one another to be provided with them, as the *law directs.*

Hardy, *supra,* at 589–90 (quoting OLIVER M. DICKERSON, BOSTON UNDER MILITARY RULE 61 (1936)). Shortly after the "Boston Tea Party," British soldiers, led by General Gage, attempted to disarm the colonists. MALCOLM, *supra,* at 144. The British Parliament banned all exports of muskets and ammunition to the colonies and began seizing the colonists' weapons and ammunition. *Id.* The British efforts to disarm the colonists hardened American resistance. At that point, the colonists began to form the "minutemen," a nationwide select militia organization. Hardy, *supra* at 890. In February 1775, a colonial militia prevented the British from seizing weapons at an armory in Salem, Massachusetts. Two months later, the colonists defeated British troops at Concord. *Id.* at 591. Distinguished colonial leaders, such as George Washington and Samuel Adams, strongly influenced the organization of these local militias. STEPHEN P. HALBROOK, THAT EVERY MAN BE ARMED: THE EVOLUTION OF A CONSTITUTIONAL RIGHT 60–61 (1984).

The "militia" which won the Revolutionary War consisted of all who were treated as full citizens of the community. George Mason stated, "Who are the militia? They consist now of the whole people." Sanford Levinson, *The Embarrassing Second Amendment,* 99 Yale L.J. 637, 647 (1989) (citing statement of George Mason (June 14, 1788), *in* 3 JONATHAN ELLIOTT, DEBATES IN THE GENERAL STATE CONVENTIONS 425 (3d ed.1937)). Similarly, the Federal Farmer referred to a "militia, when properly formed, [as] in fact the people themselves." *Id.* (quoting RICHARD HENRY LEE, OBSERVATIONS LEADING TO A FAIR EXAMINATION OF THE SYSTEM OF GOVERNMENT PROPOSED BY THE LATE CONVENTION: LETTERS FROM THE FEDERAL FARMER TO THE REPUBLICAN 123 (Walter H. Bennett ed., 1978)).

The individual right to bear arms, a right recognized in both England and the colonies, was a crucial factor in the colonists' victory over the British army in the Revolutionary War. Without that individual right, the colonists never could have won the Revolutionary War. After declaring independence from England and establishing a new government through the Constitution, the American founders sought to codify the individual right to bear arms, as did their forebears one hundred years earlier in the English Bill of Rights.

### c.

### The Ratification Debates

A foundation of American political thought during the Revolutionary period was the well justified concern about political corruption and governmental tyranny. Even the federalists, fending off their opponents who accused them of creating an oppressive regime, were careful to acknowledge the risks of tyranny. Against that backdrop, the framers saw the personal right to bear arms as a potential check against tyranny. Theodore Sedgwick of Massachusetts expressed this sentiment by declaring that it is "a chimerical idea to suppose that a country like this could ever be enslaved ... Is it possible ... that an army could be raised for the purpose of enslaving themselves or their brethren? or, if raised whether they could subdue a nation of freemen, who know how to prize liberty and who have arms in their hands?" MALCOLM, *supra* at 157 (citing 2 JONATHAN ELLIOT, THE DEBATES IN THE SEV-

ERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 97 (2d ed. 1863)). Noah Webster similarly argued:

Before a standing army can rule the people must be disarmed; as they are in almost every kingdom in Europe. The supreme power in America cannot enforce unjust laws by the sword; because the whole body of the people are armed, and constitute a force superior to any band of regular troops that can be, on any pretence, raised in the United States.

*Id.* (citing NOAH WEBSTER, AN EXAMINATION INTO THE LEADING PRINCIPLES OF THE FEDERAL CONSTITUTION (1787), *reprinted in* PAMPHLETS ON THE CONSTITUTION OF THE UNITED STATES, PUBLISHED DURING ITS DISCUSSION BY THE PEOPLE, 1787–1788, at 56 (Paul L. Ford, ed.1971) (1888)). Richard Lee Henry's view that a well regulated militia was the entire armed populace rather than a select body of men was reiterated by proponents to a bill of rights. As "M.T. Cicero" wrote to "The Citizens of America":

Whenever, therefore, the profession of arms becomes a distinct order in the state . . . the end of the social compact is defeated. . . .

No free government was ever founded, or ever preserved its liberty, without uniting the characters of the citizen and the soldier in those destined for the defence of the state. . . . Such are a well regulated militia, composed of the freeholders, citizen and husbandman, who take up arms to preserve their property, as individuals, and their rights as freemen.

HALBROOK, *supra* at 72 (citing STATE GAZETTE (Charleston), Sept. 8, 1788).

George Mason argued the importance of the militia and right to bear arms by reminding his compatriots of England's efforts "to disarm the people; that it was the best and most effectual way to enslave them . . . by totally disusing and neglecting the militia." *Id.* at 74 (citing 3 JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE

FEDERAL CONSTITUTION 380 (2d ed. 1863)). He also clarified that under prevailing practice the militia included all people, rich and poor. "Who are the militia? They consist now of the whole people, except a few public officers." *Id.* (citing 3 ELLIOT at 425–26). Because all were members of the militia, all enjoyed the right to individually bear arms to serve therein.

The framers thought the personal right to bear arms to be a paramount right by which other rights could be protected. Therefore, writing after the ratification of the Constitution, but before the election of the first Congress, James Monroe included "the right to keep and bear arms" in a list of basic "human rights" which he proposed to be added to the Constitution. HALBROOK, *supra* at 223 n. 145 (citing James Monroe Papers, New York Public Library (Miscellaneous Papers of James Monroe)).

The framers also saw an armed populace as the safeguard of religious liberty. Zachariah Johnson told the Virginia convention their liberties would be safe because

the people are not to be disarmed of their weapons. They are left in full possession of them. The government is administered by the representatives of the people, voluntarily and freely chosen. Under these circumstances should anyone attempt to establish their own system [of religion], in prejudice of the rest, they would be universally detested and opposed, and easily frustrated. This is the principle which secures religious liberty most firmly. The government will depend on the assistance of the people in the day of distress.

MALCOLM, *supra* at 157 (citing 3 ELLIOT 646).

Patrick Henry, also in the Virginia convention, eloquently argued for the dual rights to arms and resistance to oppression: "Guard with jealous attention the public liberty. Suspect everyone who approaches that jewel. Unfortunately, nothing will preserve it but downright force. Whenever you give up that force, you are

ruined." HALBROOK, *supra* at 73 (citing 3 ELLIOT at 45). Thus, the federalists agreed with Blackstone that an armed populace was the ultimate check on tyranny. MALCOLM, *supra* at 157.

While both Monroe and Adams supported ratification of the Constitution, its most influential framer was James Madison. In The Federalist No. 46, he confidently contrasted the federal government of the United States to the European despotisms which he contemptuously described as "afraid to trust the people with arms." He assured his fellow citizens that they need never fear their government because of "the advantage of being armed." Don B. Kates, Jr., *Handgun Prohibition and The Original Meaning of The Second Amendment*, 82 MICH.L.REV. 204, 228 (1983) (quoting THE FEDERALIST No. 46, at 371 (James Madison) (John. C. Hamilton ed., 1864)). Many years later, Madison restated the sentiments of The Federalist No. 46 by declaring: "[A] government resting on a minority is an aristocracy, not a Republic, and could not be safe with a numerical and physical force against it, without a standing army, an enslaved press, and a disarmed populace." *Id.* (quoting RALPH L. KETCHAM, JAMES MADISON: A BIOGRAPHY 64, 640 (1971)).

Although on the other side of the ratification debate, Anti–Federalist Patrick Henry was unequivocal on the individual right to bear arms. During the Virginia ratification convention, he objected to the Constitution's inclusion of clauses specifically authorizing a standing army and giving the federal government control of the militia. He also objected to the omission of a clause forbidding disarmament of the individual citizen: "The great object is that every man be armed.... [e]veryone who is able may have a gun." *Id.* at 229 (citing 3 J.ELLIOTT, *supra*, at 45).

By January of 1788, Delaware, Pennsylvania, New Jersey, Georgia and Connecticut ratified the Constitution without insisting upon amendments. Several specific amendments were proposed, but were not adopted at the time the Constitution was ratified. The Pennsylvania convention, for example, debated fifteen amendments, one of which concerned the right of the people to be armed, another with the militia. The amendment on the right to bear arms read:

> That the people have a right to bear arms for the defence of themselves and their own State, or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them, unless for crimes committed, or real danger of public injury from individuals; and as standing armies in time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to and be governed by the civil power.

MALCOLM, *supra* at 158 (citing PENNSYLVANIA AND THE FEDERAL CONSTITUTION, 1787–1788, at 422).

The Massachusetts convention also ratified the Constitution with an attached list of proposed amendments. *Id.* In the end, the ratification convention was so evenly divided between those for and against the Constitution that the federalists agreed to amendments to assure ratification. *Id.* Samuel Adams proposed that the Constitution

> [B]e never construed to authorize Congress to infringe the just liberty of the press, or the rights of conscience; or to prevent the people of the United States, who are peaceable citizens, from keeping their own arms; or to raise standing armies, unless when necessary for the defence of the United States, or of some one or more of them; or to prevent the people from petitioning, in a peaceable and orderly manner, the federal legislature, for a redress of their grievances: or to subject the people to unreasonable searches and seizures.

*Id.* (citing DEBATES AND PROCEEDINGS IN THE CONVENTION OF THE COMMONWEALTH OF MASSACHUSETTS, HELD IN THE YEAR 1788, at 198–

99 (Bradford Pierce and Charles Hale, ed., 1856)).

Other states which had not yet ratified the Constitution followed the Maryland convention's practice of ratifying the Constitution while submitting proposed amendments. The New Hampshire convention, for example, adopted the nine Massachusetts amendments and added three others: one to limit standing armies, a second to ensure an individual right to bear arms, and a third to protect freedom of conscience. *Id.* The proposed amendment on freedom to bear arms read: "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Id.* at 158–59 (citing 2 DOCUMENTARY HISTORY OF THE CONSTITUTION OF THE UNITED STATES, 1787–1870, at 143 (1894)).

### d.

### Drafting the Second Amendment

When the first Congress convened on March 4, 1789, James Madison, who had previously advocated passage of the Constitution without amendments, now pressed his colleagues to act on a bill of rights. MALCOLM, *supra* at 159. When his initial efforts failed to produce any response, he drafted his own version of a bill of rights and presented them to members of Congress on June 8 of that year. *Id.* He explained to Jefferson that he deliberately drafted the amendments to be unexceptional and therefore likely to win approval. *Id.* (citing RONALD RUTLAND, THE BIRTH OF THE BILL OF RIGHTS 209 (1991)). His version of what would later be the second amendment read:

> The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person.

MALCOLM, *supra* at 159.

That Madison envisioned a personal right to bear arms, rather than merely a right for the states to organize militias, is evident from his desired placement of the right in the Constitution. Madison's original plan was to designate the amendments as inserts between specific sections of the existing Constitution, rather than as separate amendments added to the end of the document. Hardy, *supra* at 609 (citing 1 ANNALS OF CONGRESS 707–08 (Joseph Gales ed., 1789)). Madison did not designate the right to keep and bear arms as a limitation of the militia clause of Section 8 of Article I. Rather, he placed it as part of a group of provisions (with freedom of speech and the press) to be inserted in "Article 1st, Section 9, between Clauses 3 and 4." *Id.* (quoting 5 DOCUMENTARY HISTORY OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 186–87 (1905)). Such a designation would have placed this right immediately following the few individual rights protected in the original Constitution, dealing with the suspension of bills of attainder, habeas corpus, and ex post facto laws. Thus Madison aligned the right to bear arms along with the other individual rights of freedom of religion and the press, rather than with congressional power to regulate the militia. *Id.* This suggested placement of the Second Amendment reflected recognition of an individual right, rather than a right dependent upon the existence of the militia.

At that point, the Senate took up the Bill of Rights. Unfortunately, Senate debate on the issue was held in secret, and therefore no record exists of that body's deliberations. CRAMER, *supra* at 58 (citing HELEN VEIT ET AL., CREATING THE BILL OF RIGHTS: THE DOCUMENTARY RECORD FROM THE FIRST FEDERAL CONGRESS xix (1991)). The Senate form of the second amendment now described the militia not as "the best security" of a free state, but as "necessary to the security" of a free state, an even stronger endorsement than Madison's original description. MALCOLM, *supra* at 161. The Senators also omitted the phrase describing the militia as "composed of the body of the people." Elbridge Gerry's

fear that future Congresses might expand on the religious exemption clause evidently convinced the Senate to eliminate that clause as well. *Id.* Even more important, however, was the Senate's refusal of a motion to add "for the common defense" after the phrase "to keep and bear arms." *Id.* (citing HALBROOK, *supra* at 81, n. 167). Thus the American Bill of Rights, like the English Bill of Rights, recognized the individual's right to have weapons for his own defense, rather than for collective defense. *Id.* In this form, Congress approved the Second Amendment and sent the Bill of Rights to the state legislatures for ratification. *Id.*

In retrospect, the framers designed the Second Amendment to guarantee an individual's right to arms for self-defense. Such an individual right was the legacy of the English Bill of Rights. American colonial practice, the constitutional ratification debates, and state proposals over the amendment all bear this out. *Id.* at 162. The American Second Amendment also expanded upon the English Bill of Rights' protection; while English law allowed weapons "suitable to a person's condition" "as allowed by law," the American right forbade any "infringement" upon the right of the people to keep and bear arms. *Id.*

In his influential *Commentaries on the Constitution,* Joseph Story emphasized the importance of the Second Amendment. He described the militia as the "natural defence of a free country" not only "against sudden foreign invasions" and "domestic insurrections," but also against "domestic usurpations of power by rulers." He went on to state that "[t]he right of the citizens to keep and bear arms has justly been considered as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them." 3 J. Story, Commentaries § 1890, p. 746 (1833).

#### 4.
### Structural Analysis

The structure of the Second Amendment within the Bill of Rights proves that the right to bear arms is an individual right, rather than a collective one. The collective rights' idea that the Second Amendment can only be viewed in terms of state or federal power "ignores the implication that might be drawn from the Second, Ninth, and Tenth Amendments: the citizenry itself can be viewed as an important third component of republican governance as far as it stands ready to defend republican liberty against the depredations of the other two structures, however futile that might appear as a practical matter." Sanford Levinson, *The Embarrassing Second Amendment,* 99 YALE L.J. 637, 651 (1989).

Furthermore, the very inclusion of the right to keep and bear arms in the Bill of Rights shows that the framers of the Constitution considered it an individual right. "After all, the Bill of Rights is not a bill of states' rights, but the bill of rights retained by the people." David Harmer, *Securing a Free State: Why The Second Amendment Matters,* 1998 BYU L.REV. 55, 60 (1998). Of the first ten amendments to the Constitution, only the Tenth concerns itself with the rights of the states, and refers to such rights in addition to, not instead of, individual rights. *Id.* Thus the structure of the Second Amendment, viewed in the context of the entire Bill of Rights, evinces an intent to recognize an individual right retained by the people.

#### 5.
### Judicial Interpretations

The Court notes that several other federal courts have held that the Second Amendment does not establish an individual right to keep and bear arms, but rather a "collective" right, or a right held by the states. *See, e.g., Hickman v. Block,* 81 F.3d 98, 100–01 (9th Cir.1996) (holding that plaintiff lacked standing to sue for denial of concealed weapons permit, because Second Amendment does not protect

possession of weapon by private citizen; right to bear arms is held by the states); *Love v. Pepersack*, 47 F.3d 120, 124 (4th Cir.1995) (holding that Second Amendment does not confer absolute individual right); *United States v. Warin*, 530 F.2d 103, 106–07 (6th Cir.1976) (holding that Second Amendment guarantees a collective rather than an individual right; fact that an individual citizen, like all others, may enroll in state militia does not confer right to possess submachine gun); *Cases v. United States*, 131 F.2d 916, 920–23 (1st Cir.1942) (holding that federal government may limit the keeping and bearing of arms by a single individual); *Hamilton v. Accu–Tek*, 935 F.Supp. 1307, 1318 (E.D.N.Y.1996) (holding that Second Amendment right to bear arms establishes a collective rather than an individual or private right).

However, the only modern Second Amendment case from the Supreme Court is *United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939). Jack Miller was charged with moving a sawed-off shotgun in interstate commerce in violation of the National Firearms Act of 1934. Among other things, Miller had not registered the firearm, as required by the Act. The court below dismissed the charge, accepting Miller's argument that the Act violated the Second Amendment.

The Supreme Court reversed unanimously, with Justice McReynolds writing the opinion. Interestingly enough, he emphasized that there was no evidence showing that a sawed-off shotgun "at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia." *Id.* at 178, 59 S.Ct. 816. And "[c]ertainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense." *Id.* at 178, 59 S.Ct. 816 (citation omitted). Thus, Miller might have had a tenable argument had he been able to show that he was keeping or bearing a weapon that clearly had a potential military use. Justice McReynolds went on to describe the purpose of the Second Amendment as "assur[ing] the continuation and render[ing] possible the effectiveness of [the Militia]." *Id.* at 178, 59 S.Ct. 816. He contrasted the Militia with troops of a standing army, which the Constitution indeed forbade the states to keep without the explicit consent of Congress. "The sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of country and laws could be secured through the Militia—civilians primarily, soldiers on occasion." *Id.* at 179, 59 S.Ct. 816. McReynolds noted further that "the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators [all][s]how plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense." *Id.*

It is difficult to interpret *Miller* as rendering the Second Amendment meaningless as a control on Congress. Ironically, one can read *Miller* as supporting some of the most extreme anti-gun control arguments; for example, that the individual citizen has a right to keep and bear bazookas, rocket launchers, and other armaments that are clearly used for modern warfare, including, of course, assault weapons. Under *Miller*, arguments about the constitutional legitimacy of a prohibition by Congress of private ownership of handguns or, what is much more likely, assault rifles, thus might turn on the usefulness of such guns in military settings. Sanford Levinson, *The Embarrassing Second Amendment*, 99 YALE L.J. 637, 654–55 (1989).

*Miller* did not answer the crucial question of whether the Second Amendment embodies an individual or collective right to bear arms. Although its holding has been used to justify many previous lower federal court rulings circumscribing Second Amendment rights, the Court in *Miller* simply chose a very narrow way to rule on the issue of gun possession under the Second Amendment, and left for another

day further questions of Second Amendment construction. *See Printz v. United States*, 521 U.S. 898, 937–38 & n. 1, 2, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (Thomas, J., concurring).

This Court has not had recent occasion to consider the nature of the substantive right safeguarded by the Second Amendment.[2] If, however, the Second Amendment is read to confer a *personal* right to "keep and bear arms," a colorable argument exists that the Federal Government's regulatory scheme, at least as it pertains to the purely intrastate sale or possession of firearms, runs afoul of that Amendment's protections.[3]

### 6.

### Prudential Concerns

Some scholars have argued that even if the original intent of the Second Amendment was to provide an individual right to bear arms, modern-day prudential concerns about social costs outweigh such original intent and should govern current review of the amendment. However, there is a problem with such reasoning. If one accepts the plausibility of any of the arguments on behalf of a strong reading of the Second Amendment, but, nevertheless, rejects them in the name of social prudence and the present-day consequences of an individual right to bear arms, why do we not apply such consequentialist criteria to each and every part of the Bill of Rights? Levinson, *supra* at 658.

As Professor Ronald Dworkin has argued, what it means to take rights seriously is that one will honor them even when there is significant social cost in doing so. Protecting freedom of speech, the rights of criminal defendants, or any other part of the Bill of Rights has significant costs—criminals going free, oppressed groups having to hear viciously racist speech and so on—consequences which we take for granted in defending the Bill of Rights. This mind-set changes, however, when the Second Amendment is concerned. "Cost-benefit" analysis, rightly or wrongly, has become viewed as a "conservative" weapon to attack liberal rights. Yet the tables are strikingly turned when the Second Amendment comes into play. Here "conservatives" argue in effect that social costs are irrelevant and "liberals" argue for a notion

**2.** "Our most recent treatment of the Second Amendment occurred in *United States v. Miller*, 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), in which we reversed the District Court's invalidation of the National Firearms Act, enacted in 1934. In *Miller*, we determined that the Second Amendment did not guarantee a citizen's right to possess a sawed-off shotgun because that weapon had not been shown to be 'ordinary military equipment' that could 'contribute to the common defense.' *Id.*, at 178, 59 S.Ct. 816. The Court did not, however, attempt to define, or otherwise construe, the substantive right protected by the Second Amendment."

**3.** "Marshaling an impressive array of historical evidence, a growing body of scholarly commentary indicates that the 'right to keep and bear arms' is, as the Amendment's text suggests, a personal right. See, *e.g.*, J. Malcolm, To Keep and Bear Arms: The Origins of an Anglo–American Right 162 (1994); S. Halbrook, That Every Man Be Armed, The Evolution of a Constitutional Right (1984); Van Alstyne, The Second Amendment and the Personal Right to Arms, 43 Duke L.J. 1236 (1994); Amar, The Bill of Rights and the

Fourteenth Amendment, 101 Yale L.J. 1193 (1992); Control & Diamond, The Second Amendment: Toward an Afro–Americanist Reconsideration, 80 Geo.L.J. 309 (1991); Levinson, The Embarrassing Second Amendment, 99 Yale L.J. 637 (1989); Kates, Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich.L.Rev. 204 (1983). Other scholars, however, argue that the Second Amendment does not secure a personal right to keep or bear arms. . See, *e.g.*, Bogus, Race, Riots, and Guns, 66 S.Cal. L.Rev. 1365 (1993); Williams, Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment, 101 Yale L.J. 551 (1991); Brown, Guns, Cowboys, Philadelphia Mayors, and Civic Republicanism: On Sanford Levinson's The Embarrassing Second Amendment, 99 Yale L.J. 661 (1989); Cress, An Armed Community: The Origins and Meaning of the Right to Bear Arms, 71 J. of Am.Hist. 22 (1984). Although somewhat overlooked in our jurisprudence, the Amendment has certainly engendered considerable academic, as well as public, debate."

of the "living Constitution" and "changed circumstances" that would have the practical consequence of erasing the Second Amendment from the Constitution. Levinson, *supra* at 657–58.

Other commentators, including Justice Scalia, have argued that even if there would be "few tears shed if and when the Second Amendment is held to guarantee nothing more than the state National Guard, this would simply show that the Founders were right when they feared that some future generation might wish to abandon liberties that they considered essential, and so sought to protect those liberties in a Bill of Rights. We may tolerate the abridgement of property rights and the elimination of a right to bear arms; but we should not pretend that these are not reductions of rights." Sanford Levinson, *Is the Second Amendment Finally Becoming Recognized As Part of the Constitution? Voices from the Courts*, 1998 Byu L.Rev. 127, 132 (1998) (quoting Antonin Scalia, *Common–Law Courts in a Civil–Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws, in A Matter of Interpretation: Federal Courts and the Law* 3, 43 (Amy Gutmann, ed.1997)).

In response to arguments propounded by Professor Laurence Tribe and others describing the Second Amendment as being simply "seemingly state-militia-based" rather than "supporting broad principles" of private ownership of guns, Justice Scalia pointed out that it is incorrect to assume that the word "militia" refers only to " 'a select group of citizen-soldiers . . . rather than', as the Virginia Bill of Rights of June 1776 defined it, 'the body of the people, trained to arms.' " Antonin Scalia, Response, in *A Matter of Interpretation,* supra at 129, 136 n. 13 (quoting Joyce Lee Malcolm, To Keep and Bear Arms 136, 148 (1994)).

Justice Scalia also notes that "[t]his was also the conception of 'militia' entertained by James Madison," citing The Federalist No. 46 for support. *Id.* "It would also be

strange," he goes on to say, "to find in the midst of a catalog of the rights of individuals a provision securing to the states the right to maintain a designated 'Militia.' Dispassionate scholarship suggests quite strongly that the right of the people to keep and bear arms meant just that." *Id.* at 137 n. 13 (citing Joyce Lee Malcolm, To Keep and Bear Arms (1994); William Van Alstyne, *The Second Amendment and the Personal Right to Arms,* 43 Duke L.J. 1236 (1994)).

Justice Scalia concludes by stating that "[i]t is very likely that modern Americans no longer look contemptuously, as Madison did, upon the governments of Europe that 'are afraid to trust the people with arms,' The Federalist No. 46; and the . . . Constitution that Professor Tribe espouses will probably give effect to that new sentiment by effectively eliminating the Second Amendment. But there is no need to deceive ourselves as to what the original Second Amendment said and meant. Of course, properly understood, it is no limitation upon arms control by the states." *Id.*

Thus, concerns about the social costs of enforcing the Second Amendment must be outweighed by considering the lengths to which the federal courts have gone to uphold other rights in the Constitution. The rights of the Second Amendment should be as zealously guarded as the other individual liberties enshrined in the Bill of Rights.

**7.**

### Constitutionality of 18 U.S.C. § 922(g)(8)

■ 18 U.S.C. § 922(g)(8) is unconstitutional because it allows a state court divorce proceeding, without particularized findings of the threat of future violence, to automatically deprive a citizen of his Second Amendment rights. The statute allows, but does not require, that the restraining order include a finding that the person under the order represents a credible threat to the physical safety of the intimate partner or child. 18 U.S.C. § 922(g)(8)(C)(i). If the statute only crimi-

nalized gun possession based upon court orders with particularized findings of the likelihood of violence, then the statute would not be so offensive, because there would be a reasonable nexus between gun possession and the threat of violence. However, the statute is infirm because it allows one to be subject to federal felony prosecution if the order merely "prohibits the use, attempted use, or threatened use of physical force against [an] intimate partner." 18 U.S.C. § 922(g)(8)(C)(ii).

However, prosecution based on such an order would be tautological, for § 922(g)(8)(C)(i) merely repeats in different wording the requirement in subsection (B) that the order "restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child." § 922(g)(8)(B). All that is required for prosecution under the Act is a boilerplate order with no particularized findings. Thus, the statute has no real safeguards against an arbitrary abridgement of Second Amendment rights. Therefore, by criminalizing protected Second Amendment activity based upon a civil state court order with no particularized findings, the statute is over-broad and in direct violation of an individual's Second Amendment rights.

By contrast, § 922(g)(8) is different from the felon-in-possession statute, 18 U.S.C. § 922(g)(1), because once an individual is convicted of a felony, he has by his criminal conduct taken himself outside the class of law-abiding citizens who enjoy full exercise of their civil rights. Furthermore, the convicted felon is admonished in state and federal courts that a felony conviction results in the loss of certain civil rights, including the right to bear arms. This is not so with § 922(g)(8). Under this statute, a person can lose his Second Amendment rights not because he has committed some wrong in the past, or

because a judge finds he may commit some crime in the future, but merely because he is in a divorce proceeding. Although he may not be a criminal at all, he is stripped of his right to bear arms as much as a convicted felon. Second Amendment rights should not be so easily abridged.

It is absurd that a boilerplate state court divorce order can collaterally and automatically extinguish a law-abiding citizen's Second Amendment rights, particularly when neither the judge issuing the order, nor the parties nor their attorneys are aware of the federal criminal penalties arising from firearm possession after entry of the restraining order. That such a routine civil order has such extensive consequences totally attenuated from divorce proceedings makes the statute unconstitutional. There must be a limit to government regulation on lawful firearm possession. This statute exceeds that limit, and therefore it is unconstitutional.

### C.

### Fifth Amendment

■ Emerson also contends that 18 U.S.C. § 922(g)(8) violates his Fifth Amendment due process rights. He argues that the perfunctory, generic temporary orders issued in his divorce proceedings expose him to federal criminal liability for engaging in otherwise lawful conduct.

Firearm possession is a valuable liberty interest imbedded in the Second Amendment to the United States Constitution. "[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country." *Staples v. United States,* 511 U.S. 600, 610, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). Thus, Emerson has a protected liberty interest in firearm possession under the Fifth Amendment.

"It is wrong to convict a person of a crime if he had no reason to believe that the act for which he was convicted *was* a crime, or even that it was wrongful. This is one of the bedrock principles of American law. It lies at the heart of any civi-

lized system of law." *United States v. Wilson*, 159 F.3d 280, 293 (7th Cir.1998) (Posner, C.J., dissenting). It offends both substantive and procedural due process for Emerson to be convicted of a crime he did not know existed. Because 18 U.S.C. § 922(g)(8) is such an obscure criminal provision, it is unfair to hold him accountable for his otherwise lawful actions.

The conduct this statute criminalizes is *malum prohibitum*, not *malum in se*. In other words, there was nothing inherently evil about Emerson possessing a firearm while being under a domestic restraining order. His conduct was unlawful merely because the statute mandated that it be. *Wilson*, 159 F.3d at 294 (Posner, C.J., dissenting). Section 922(g)(8) is one of the most obscure of criminal provisions. Here, Emerson owned a firearm, and knew or should have known that if, for example, he was convicted of a felony, he would have to relinquish ownership of his firearm. If by chance he did not know this, the sentencing judge or the probation officer would have informed him of the law. Nevertheless, when Emerson was made subject to the restraining order telling him to not harass his wife, Emerson could not have known of the requirement to relinquish his gun unless the presiding judge issuing the order told him. In this case, the state district judge did not tell Emerson about the requirement. Emerson's attorney did not tell him either, because Emerson did not have a lawyer. The fact that the restraining order contained no reference to guns may have led Emerson to believe that since he complied with the order, he could carry on as before. *Id.* at 294–95.

Chief Judge Posner of the Seventh Circuit aptly explains the dilemma between the maxim "ignorance of the law is no excuse" and the inherent unreasonableness of criminal prosecutions involving obscure violations of law:

> We want people to familiarize themselves with the laws bearing on their activities. But a reasonable opportunity doesn't mean being able to go to a local law library and read Title 18. It would be preposterous to suppose that someone from [the defendant's] milieu is able to take advantage of such an opportunity. If none of the conditions that make it reasonable to dispense with proof of knowledge of the law is present, then to intone "ignorance of the law is no defense" is to condone a violation of fundamental principles for the sake of a modest economy in the administration of criminal justice.

*Id.* at 295.

Section 922(g)(8) is also one of those "highly technical statutes that present ... the danger of ensnaring individuals engaged in apparently innocent conduct," of which the Supreme Court spoke in *Bryan v. United States*, 524 U.S. 184, 118 S.Ct. 1939, 1946–47, 141 L.Ed.2d 197 (1998). Emerson's case differs from *Bryan* because the statute in this case is easy to understand, but it is hard to discover, which in the end compels the same result as demonstrated by *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957).

In *Lambert*, a Los Angeles ordinance made it a crime for a convicted felon to remain in the city for more than five days without registering. Mrs. Lambert, a felon, failed to register. The Supreme Court held that the ordinance violated due process when applied to a person who had no notice of a duty to report. *Id.* at 229, 78 S.Ct. 240. The Court found that, while a legislative body may eliminate the *mens rea* from the elements of an offense, the constitutional requirement of due process of law places limits on this practice. *Id.* at 228, 78 S.Ct. 240. "[T]he existence of a *mens rea* is the rule of, rather than the exception to, the principles of Anglo–American criminal jurisprudence." *Staples*, 511 U.S. at 605, 114 S.Ct. 1793 (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 436–37, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978)). However, eliminating the *mens rea* requirement is such a

fundamental departure from longstanding principles of criminal law that courts have demanded an indication of legislative intent to do so. *Staples,* 511 U.S. at 606, 114 S.Ct. 1793. Due process requires some adequate, meaningful form of a fair warning or notice to a respondent to a protective order that he will be committing a crime if he possesses a firearm.

Because § 922(g)(8) is an obscure, highly technical statute with no *mens rea* requirement, it violates Emerson's Fifth Amendment due process rights to be subject to prosecution without proof of knowledge that he was violating the statute. Accordingly, Emerson's Motion to Dismiss the indictment as violative of the Fifth Amendment is granted.

### D.

### Tenth Amendment

█ Emerson's last argument claims that 18 U.S.C. § 922(g)(8) violates the Tenth Amendment. The Tenth Amendment provides that:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

U.S. Const. amend. X.

In *New York v. United States,* 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), the Court noted that Tenth Amendment issues can be resolved in one of two ways. The court can first inquire whether an Act of Congress is authorized by one of the powers of Article I of the Constitution. *Id.* at 155, 112 S.Ct. 2408 (citing, *e.g., Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971); *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819)). In other cases the court determines whether the Act of Congress invades the province of state sovereignty reserved by the Tenth Amendment. *Id.* (citing *Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985); *Lane Coun-*

*ty v. Oregon,* 74 U.S. (7 Wall.) 71, 19 L.Ed. 101 (1868)).

"If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York,* 505 U.S. at 156, 112 S.Ct. 2408 (citations omitted).

Because the Fifth Circuit has held that Congress acted pursuant to its enumerated Commerce Clause power under Article I, Congress therefore enacted 18 U.S.C. § 922(g)(8) pursuant to a valid grant of power in conformity with the Tenth Amendment. *United States v. Pierson,* 139 F.3d 501 (5th Cir.1998). As mentioned previously, the court in *Pierson* held that by creating a nexus between illegal firearm possession and interstate commerce, Congress exercised its delegated power under the Commerce Clause to reach a "discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce." *Id.* at 503. Therefore, under the first line of inquiry set forth in *New York,* the statute is constitutional under the Tenth Amendment.

The Court now turns to the second line of inquiry, whether the "Act of Congress invades the province of state sovereignty reserved by the Tenth Amendment." *New York,* 505 U.S. at 155, 112 S.Ct. 2408. In *New York,* the Court held that the Low–Level Radioactive Waste Policy Amendments Act of 1985 unconstitutionally "commandeer[ed] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *Id.* at 176, 112 S.Ct. 2408 (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 288, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981)).

In 1997, the Court refined this analysis by holding in *Printz v. United States* that Congress may act pursuant to its Commerce Clause powers and still violate prin-

ciples of state sovereignty under the Tenth Amendment. 521 U.S. 898, 933, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). In *Printz,* the Brady Act commandeered state law enforcement officers to perform background checks on prospective handgun owners. The Court held unconstitutional this asserted power of the Federal Government "to impress into its service—and at no cost to itself—the police officers of the 50 states." *Id.* at 922, 117 S.Ct. 2365.

By passing 18 U.S.C. § 922(g)(8), however, Congress did not violate the Tenth Amendment the way it did in *New York* and *Printz,* because here the federal government is not requiring state legislatures to pass specific laws, nor is it "commandeering" state governments into federal government service. Emerson argues, however, that § 922(g)(8) interferes with the ability of state judges to carry out their state's domestic relations laws, thus impermissibly regulating an area reserved for the states. It is true the Supreme Court has noted that family law is traditionally an area of state concern. *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 581, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979). And while it is arguable that § 922(g)(8) may offend general Tenth Amendment principles of federalism, because Congress was acting through an enumerated power in drafting the law, and the law does not command state activity in support of it, this statute does not clearly violate the Tenth Amendment under the Supreme Court's holdings in *New York* and *Printz.* Accordingly, Emerson's Tenth Amendment challenge to the statute fails.

### III.

### CONCLUSION

Because 18 U.S.C. § 922(g)(8) violates the Second and Fifth Amendments to the United States Constitution, the Court **GRANTS** Emerson's Motion to Dismiss

the Indictment. A judgment shall be entered in conformity with this opinion.

SO ORDERED.