USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1905 

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 CHRISTOPHER MEADE,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Edward F. Harrington, U.S. District Judge]

 Before

 Selya, Boudin and Stahl,
 
 Circuit Judges.
 
 
 
 
 
 Leo T. Sorokin, Federal Defender Office, for appellant.
 Jennifer Zacks, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney, was on brief, for
appellee.

May 11, 1999

 SELYA, Circuit Judge. This appeal requires us to address
questions of first impression concerning the construction and
constitutionality of two recently-enacted federal firearms laws, 18
U.S.C. 922(g)(8) and 18 U.S.C. 922(g)(9), both of which were
intended to help curb the escalating societal problems associated
with domestic violence. We conclude that these statutory
provisions withstand the appellant's vigorous challenge.
 I
 In the early morning hours of May 16, 1997, defendant-
appellant Christopher Meade began pounding on the door of his
estranged wife's apartment in Lynn, Massachusetts, threatening to
shoot her. When police arrived, they discovered a number of
persons, including Meade himself, gathered outside the dwelling. 
The officers instructed all those at the scene to lie face down and
display their hands. Instead of obeying, Meade crouched by the
side of a parked car and thrust his hand into it. The police later
retrieved a loaded handgun from the automobile. Neither the
handgun nor the ammunition had been manufactured in Massachusetts.
 A recently-enacted federal law makes it a crime for a
person who is subject to a judicial anti-harassment or anti-
stalking order to possess firearms that have been shipped or
transported in interstate commerce. See 18 U.S.C. 922(g)(8)
(quoted infra note 3). Another recently-enacted federal law makes
it a crime for a person who has committed a "misdemeanor crime of
domestic violence" to possess such a weapon. See 18 U.S.C. 
922(g)(9). Meade ran afoul of both proscriptions: on May 16,
1997, he had a prior misdemeanor conviction for assaulting his
spouse, and he was subject to a state court restraining order,
issued pursuant to Mass. Gen. Laws ch. 209A, prohibiting contact
with her. Consequently, the United States charged Meade with
having violated sections 922(g)(8) and (9). A jury found him
guilty on both counts and the district court imposed a 78-month
incarcerative sentence. Meade now appeals.
 II
 Defying numerical order, we start with 18 U.S.C. 
922(g)(9). In relevant part, this statute renders it "unlawful for
any person . . . who has been convicted in any court of a
misdemeanor crime of domestic violence" to possess "any firearm or
ammunition . . . which has been shipped or transported in
interstate or foreign commerce." The appellant, whose only
potential predicate offense is a misdemeanor conviction under a
general assault and battery statute, Mass. Gen. Laws ch. 265, 
13A, claims that the district court erred in treating that
conviction as a "misdemeanor crime of domestic violence" within the
purview of 18 U.S.C. 922(g)(9).
 The linguistic hook upon which Meade fastens this claim
appears in an ancillary definitional statute, 18 U.S.C. 
921(a)(33)(A), which characterizes a "misdemeanor crime of domestic
violence" as an offense that is a misdemeanor under state law, see
id. 921(a)(33)(A)(i), and which "has, as an element, the use or
attempted use of physical force, or the threatened use of a deadly
weapon, committed by a current or former spouse, parent, or
guardian of the victim, by a person with whom the victim shares a
child in common, by a person who is cohabiting with or has
cohabited with the victim as a spouse, parent, or guardian, or by
a person similarly situated to a spouse, parent, or guardian of the
victim," id. 921(a)(33)(A)(ii). Meade acknowledges that his
prior conviction satisfies the first criterion (i.e., it was for a
misdemeanor), but insists that it fails to satisfy the second
criterion because the underlying statute does not have as an
element the relationship status between misdemeanant and victim. 
As the appellant sees it, the only crimes that fit within the
quoted language (and, thus, the only crimes that may serve as
predicate offenses for purposes of section 922(g)(9)) are those
which, as part of their formal definition, require a showing of
both the mode of aggression (e.g., the use of a weapon) and the
assailant's relationship status (e.g., spouse). The district court
rejected this exercise in statutory interpretation, see United
States v. Meade, 986 F. Supp. 66, 68 (D. Mass. 1997), and so do we.
 Meade's argument depends on the answer to the following
question: Did Congress intend that only misdemeanors which include
the relationship status as an element within their formal
definition would count as predicate offenses under section
922(g)(9)? Our search for this answer must begin with the language
that Congress used in crafting the statutory scheme. See United
States v. Charles George Trucking Co., 823 F.2d 685, 688 (1st Cir.
1987). That perspective focuses our attention on the word
"element" in the text of section 921(a)(33)(A)(ii). This singular
noun is followed not by one, but by two conceptually distinct
attributes: the mode of aggression and the perpetrator's
relationship to the victim. Meade's gloss on the reach of the word
"element" indiscriminately conflates the two.
 We reject this gloss. In construing statutes, courts
should presume, absent contrary evidence, that Congress knew, and
meant to adopt, the background legal concepts associated with the
words that it chose to incorporate into a law. See Morissette v.
United States, 342 U.S. 246, 263 (1952); Greenwood Trust Co. v.
Massachusetts, 971 F.2d 818, 827 (1st Cir. 1992). The word
"element" fits into this category. It is singular, and, absent
evidence that Congress wished to deviate from customary usage, it
should be read to refer only to the immediately following
attribute. Since no such evidence exists, we conclude, without
serious question, that only the mode of aggression, not the
relationship status between perpetrator and victim, must appear
within the formal definition of an antecedent misdemeanor to
constitute it as a predicate offense.
 We could well end our interpretive inquiry at this
juncture. When, as now, the plain language of a statute
unambiguously reveals its meaning, and the revealed meaning is not
eccentric, courts need not consult other aids to statutory
construction. See Salinas v. United States, 118 S. Ct. 469, 474
(1997); Charles George Trucking, 823 F.2d at 688. From time to
time, however, courts (perhaps manifesting a certain institutional
insecurity) employ such secondary sources as a means of
confirmation. See, e.g., Negonsott v. Samuels, 507 U.S. 99, 106-09
(1993); Mullin v. Raytheon Co., 164 F.3d 696, 702-03 (1st Cir.
1999); Barker v. United States Dep't of Labor, 138 F.3d 431, 436
(1st Cir. 1998). In this instance, such an exercise removes any
lingering doubt.
 The statute's legislative history is particularly helpful
in this regard. In describing the interrelationship between
section 922(g)(9) and other gun-control laws on the Senate floor,
the legislation's chief sponsor noted presciently that "convictions
for domestic violence-related crimes often are for crimes, such as
assault, that are not explicitly identified as related to domestic
violence." 142 Cong. Rec. S11878 (1996) (statement of Sen.
Lautenberg). For this reason, he urged local law enforcement
authorities administering gun registration provisions "to
thoroughly investigate misdemeanor convictions on an applicant's
criminal record to ensure that none involves domestic violence,
before allowing the sale of a handgun." Id. These statements,
made by the principal architect of the bill before final passage,
clearly demonstrate Congress's threshold understanding that
"misdemeanor crime[s] of domestic violence" would not be limited to
those in which the relationship status was included as a formal
element of the statute of conviction.
 There are, of course, limitations on the extent to which
courts appropriately may rely on the statements of individual
legislators to color the meaning of statutory language. See, e.g.,
Regan v. Wald, 468 U.S. 222, 237 (1984). Withal, contemporaneous
statements by a sponsor, although far from conclusive, are
generally entitled to respect. See North Haven Bd. of Educ. v.
Bell, 456 U.S. 512, 526-27 (1982); FEA v. Algonquin SNG, Inc., 426
U.S. 548, 564 (1976). Moreover, in analyzing legislative history,
specificity breeds credibility; thus, particularized explanations
of how specific provisions of an act are meant to work have been
deemed more instructive than generalized pronouncements anent
statutory purpose. See Regan, 468 U.S. at 237 (recognizing that
statements made in floor debates may be persuasive as to Congress's
intent when they are "very precisely directed to the intended
meaning of particular words in a statute"). The statements we have
quoted are of this genre. Perhaps most important, Senator
Lautenberg's comments are perfectly consistent with the statutory
language and the general purpose of the legislation, and promote a
logically and linguistically coherent exegesis of the provision
here at issue. They therefore reinforce the construction to which
we are led by the plain meaning of the statutory text. See Brock
v. Pierce County, 476 U.S. 253, 263 (1986) (noting that statements
in floor debates evidence legislative intent when they are
consistent with statutory language and other legislative history).
 We note, too, that plain language can be made more (or
less) compelling by a frank consideration of possible alternatives. 
Reading section 922(g)(9) in the manner that the appellant
advocates would lead to a significant practical anomaly and would
frustrate the clear purpose behind the law, which contemplated that
the ban on firearms possession would apply broadly to all those
falling into the relevant categories. See 18 U.S.C. 922(g)(9)
(making it "unlawful for any person . . . who has been convicted in
any court of a misdemeanor crime of domestic violence" to possess
"any firearm or ammunition") (emphasis supplied); see also Barrett
v. United States, 423 U.S. 212, 218 (1976) (remarking, in the
course of interpreting 18 U.S.C. 922, that its "very structure .
. . demonstrates that Congress . . . sought broadly to keep
firearms away from the persons Congress classified as potentially
irresponsible and dangerous"). Fewer than half the states have
misdemeanor statutes that formally include relationship status as
an element of a misdemeanor domestic assault offense. Others, like
Massachusetts, rely on general misdemeanor statutes to accomplish
the same ends. Thus, the appellant's interpretation of section
922(g)(9) would render the statute a dead letter in most
jurisdictions an outcome that Congress hardly could have
intended. This lack of congruence strengthens the pull of plain
language; courts, after all, should not strain to reach results
that inhibit the uniform and consistent application of a federal
criminal statute.
 The appellant counters this statutory analysis with an
array of asseverations, none of which we find persuasive. First,
he maintains that had Congress intended not to require relationship
status to be a formal element of a misdemeanor crime of domestic
violence, it could have written the law differently (to say, for
instance, that such a crime is an offense that "has, as an element"
the use of force or a weapon, "and was committed by" someone within
a relevant relationship). But Congress is not required to draft
statutes in ways that are precise to the point of pedantry. As
long as a statute, as written, is reasonably clear and does not
lead to absurd outcomes, courts should construe it according to its
tenor. See Salinas, 118 S. Ct. at 474; Negonsott, 507 U.S. at 104;
Charles George Trucking, 823 F.2d at 688. In all events, Meade's
counterfactual does nothing to bolster his problematic
interpretation of the statute.
 Next, the appellant directs our attention to several
statutes including solicitation and sentence-enhancement laws 
in which Congress has employed a more or less comparable linguistic
structure that defines a "crime of violence" as an offense that
"has as an element" the use or threatened use of force or of a
deadly weapon against the person or property of another. See,
e.g., 18 U.S.C. 16(a), 373(a), 521(c)(2), 924(c)(3)(A),
924(e)(2)(B)(i), 3156(a)(4)(A), 3559(c)(2)(F)(ii). In the
appellant's view, such statutes routinely collapse the mode and
object of aggression into a single element, and, thus, suggest that
section 921(a)(33)(A)(ii) should be construed to encompass both
mode of aggression and relationship status under the "element"
rubric. It is true, of course, that Congress's use of parallel
language and construction in different statutes may at times inform
judicial interpretation. See Irving v. United States, 162 F.3d
153, 163 (1st Cir. 1998) (en banc); Greenwood Trust, 971 F.2d at
827. Here, however, three flaws mar the fabric of the appellant's
construct.
 First, Congress has made manifest its intent, and there
is no need to resort to other aids (including other statutes) for
assistance in the interpretive process. See Norfolk & W. Ry. Co.
v. American Train Dispatchers' Ass'n, 499 U.S. 117, 129 (1991)
(declining to resort to a canon of construction that supported a
particular interpretation of a statute when the "whole context,"
including the statute's plain language, "dictate[d] a different
conclusion"). Second, precedent teaches that the case for
construing one statute in a manner similar to another is weakest
when the two have significant differences, see, e.g., United States
v. Granderson, 511 U.S. 39, 50-51 (1994), and, here, the appellant
seeks to compare plums with pomegranates. Section 922(g)(9) has a
distinct, focused, and singular purpose that is not covered by any
of the other statutes that Meade identifies. This, combined with
the fact that Meade's proposed interpretation completely frustrates
congressional intent, is more than sufficient to defeat his
tendered comparison and consign his argument to the scrap heap. 
See Granderson, 511 U.S. at 50-51. Last, but not least, the
appellant's interpretation is open to serious question; the
statutes that he advertises as fair congeners seem somewhat less
than that. Cf. Taylor v. United States, 495 U.S. 575, 600 (1990)
(discussing 18 U.S.C. 924(e)(2)(B)(i) and identifying only "the
use or threat of force" as textually linked to "has as an
element"). In sum, because the misdemeanant-in-possession statute
is unambiguous and does not parallel the proffered provisions in
substance, or in purpose, or, ultimately, in language, we refuse to
follow Meade's excursion into comparative analysis.
 The appellant has a fallback position. He notes that
courts by and large have taken a so-called categorical approach in
construing statutes and sentencing guidelines that incorporate
"predicate offense" concepts. See, e.g., Taylor, 495 U.S. at 600-
01 (construing 18 U.S.C. 924(e)); United States v. Winter, 22
F.3d 15, 18 (1st Cir. 1994) (construing USSG 4B1.1). From this,
Meade concludes that only state statutes that include relationship
status as an element of the formal definition of a domestic
violence misdemeanor may be considered predicate offenses for
purposes of 18 U.S.C. 922(g)(9). This argument fundamentally
misapprehends the problem that the categorical approach addresses.
 The task before the Taylor Court was to determine the
precise meaning of the term "burglary" as used in a sentence-
enhancement statute, 18 U.S.C. 924(e). After reviewing the
relevant legislative history, the Court determined that Congress
meant the term to carry a generic definition. See Taylor, 495 U.S.
at 589-90. Having established Congress's intent with respect to
the meaning of the word "burglary" the crime that Congress had
specified as a predicate offense the Taylor Court then proceeded
to consider a logically posterior question: Could prosecutors seek
enhancements for convictions that had been obtained under statutes
that encompassed both burglary and other crimes (not themselves
eligible to serve as sentence enhancers)? See id. at 599-600. 
This question raised a broader issue as to whether courts should
look to statutory definitions of prior offenses or to the
defendant's underlying acts in order to determine whether a prior
conviction might be considered a predicate offense for sentence-
enhancement purposes. See id. The Court responded with a
preference for a categorical approach that would focus primarily on
formal definitions. See id. at 600-01.
 The Taylor Court's sequencing of the two inquiries that
we have described explodes Meade's argument. Before engaging in a
categorical approach, one first must have established the formal
definition of the particular predicate offense, a process that
necessarily requires determining the requisite elements of the
statute of conviction. The appellant's attempt to establish the
formal definition of a "misdemeanor crime of domestic violence" by
direct resort to a categorical approach thus puts the cart before
the horse.
 The appellant next contends that section 922(g)(9) is
unconstitutionally vague because it does not define the offense
with sufficient clarity that an ordinary person can ascertain
whether his actions would fall within its proscriptions. We reject
this contention out of hand. Criminal statutes are
unconstitutionally vague if they do not adequately specify the
conduct that they prohibit or the class of persons to whom they
apply. See, e.g., United States v. Lanier, 520 U.S. 259, 265-66
(1992); Bouie v. City of Columbia, 378 U.S. 347, 350-51 (1964). 
Here, the statute sub judice contains no ambiguity either as to the
persons to whom the prohibitions apply or as to what conduct is
proscribed. Nor does the appellant's contention that a
misdemeanant convicted under a general statute will not know
whether his conviction will count as a predicate offense alter the
calculus. It is, after all, fair to presume that a misdemeanant
will know his relationship with his victim.
 As a final matter, the appellant argues that the rule of
lenity should weigh in his favor. The rule of lenity has bearing
only if, after a full examination of a particular statute, an
inquiring court must guess at what Congress intended. See Holloway
v. United States, 119 S. Ct. 966, 972 n.14 (1999); United States v.
O'Neil, 11 F.3d 292, 301 n.10 (1st Cir. 1993). In this instance,
Congress's intent is clear. Consequently, the rule of lenity is
inapposite.
 III
 Those convicted of misdemeanors in Massachusetts do not
automatically lose their civil rights upon conviction. See United
States v. Indelicato, 97 F.3d 627, 629 (1st Cir. 1996). So it was
with Meade who, upon being convicted of misdemeanor assault and
battery against his spouse, was sentenced to probation. However,
Meade subsequently lost one of his civil rights the right to sit
on a jury when he was incarcerated after having violated his
probation. See Mass. Gen. Laws ch. 234A, 4(7) (prohibiting jury
service while incarcerated). Because that disability ended when
Meade's immurement ended, he asseverates that his civil rights were
"restored," and that, therefore, his misdemeanor conviction should
not qualify as a predicate offense for purposes of 18 U.S.C. 
922(g)(9). See id. 921(a)(33)(B)(ii) (stating, inter alia, that
a conviction does not count as a misdemeanor crime of domestic
violence if the offender, after losing his civil rights on that
account, has had them restored).
 A major, and dispositive, problem with this asseveration
is that the appellant has waived it and, accordingly, there is no
error to review. See United States v. Olano, 507 U.S. 725, 732-33
(1993); United States v. Mitchell, 85 F.3d 800, 807-08 (1st Cir.
1996). The record shows that, toward the close of the government's
case in chief, Meade's counsel noted his client's willingness to
stipulate that "prior to May 15th [Meade] was convicted of a
misdemeanor assault and battery, which is a misdemeanor crime of
domestic violence, and . . . to agree . . . that the jury will be
instructed they will accept that element as found." Counsel placed
only a single qualification on this stipulation, reserving for
appeal the legal question discussed in Part II of this opinion,
namely, whether section 922(g)(9) required that misdemeanor crimes
of domestic violence must include the necessary relationship status
as an element before those crimes can qualify as predicate
offenses. The government acquiesced in the stipulation and the
condition, as did the district court. The trial proceeded on that
basis.
 As a general matter, a criminal defendant who stipulates
to an element of an offense relinquishes his right to test the
government's case with respect to the existence of the facts
underlying that particular. See United States v. Hardin, 139 F.3d
813, 816 (11th Cir.), cert. denied, 119 S. Ct. 225 (1998); United
States v. Melina, 101 F.3d 567, 572 (8th Cir. 1996); United States
v. Muse, 83 F.3d 672, 678 (4th Cir. 1996). Thus, Meade cannot now
challenge the fact of his misdemeanor conviction. The slightly
more difficult question is whether a stipulation as to facts also
functions as a waiver of legal defenses to the establishment of the
particular element to which the parties have stipulated. We
believe that it does.
 To assert that a stipulation to an element of a crime
does not affect legal defenses is to build an artificial wall
between factual and legal arguments. The prosecution's successful
establishment of an element of a crime does not invariably depend
on showing merely that a certain set of facts exist; there are
often legal barriers to scale as well. This case illustrates the
point: establishing the predicate misdemeanor crime of domestic
violence hinged not only on producing an official record attesting
to an underlying conviction, but also on overcoming whatever legal
defenses Meade mounted in regard to the materiality of that
conviction. Given that reality, and given the corollary fact that
criminal defendants frequently gain strategic benefits from
entering into stipulations, see, e.g., Old Chief v. United States,
519 U.S. 172, 174 (1997); United States v. Tavares, 21 F.3d 1, 4-5
(1st Cir. 1994) (en banc), common sense suggests that the decision
to forgo a defense with respect to a particular element involves
more than an assessment of whether the relevant facts can
successfully be disputed. It follows that when a defendant
affirmatively agrees not to put the government to its proof of an
element of a crime, a court may presume, in the absence of an
express reservation, that the defendant has considered all of his
available options, factual and legal, and determined that the
better course is to allocate his energies elsewhere. See Melina,
101 F.3d at 572 (holding that defendant's stipulation to the
interstate commerce element of 18 U.S.C. 844(i) constituted a
"complete waiver of the issue"); United States v. Clark, 993 F.2d
402, 405-06 (4th Cir. 1993) (holding that defendant's stipulation
that the predicate offense element under 18 U.S.C. 922(g) had
been satisfied "relieved [the government] of any obligation of
proving any aspect of that element, including the aspect that the
defendant's civil rights had not been restored"); cf. United States
v. Broce, 488 U.S. 563, 569-74 (1989) (holding that a defendant who
pleads guilty unconditionally thereby relinquishes his entitlement
to challenge either the facts or the legal theories supporting the
charge).
 This rule governs here. There was not the slightest
indication at any point in the proceedings below that Meade
intended to raise or preserve any legal defenses apart from his
"relationship status" defense. To the precise contrary, the
totality of the circumstances (especially Meade's stipulation to
the predicate offense, his acquiescence in the jury instructions
that followed, and his affirmative preservation of a different
legal defense) compels a determination that Meade relinquished all
other defenses, factual and legal, pertaining to the stipulated
element. We therefore rebuff Meade's suggestion that his newly-
minted restoration of rights defense was left open by the parties,
sub silentio, to be addressed at a later date. That defense was
waived. See United States v. Valenzuela, 150 F.3d 664, 667-68 (7th
Cir. 1998) (finding waiver when defendant could have preserved his
rights to a legal defense in connection with his factual admission
anent drug sales, but failed to do so). And since waived defenses,
unlike forfeited defenses, are not amenable to plain-error review,
the only other thing that need be said is that, taken to its
logical conclusion, the same waiver analysis dooms Meade's
argument, advanced for the first time in this venue, that the
restoration of rights provision violates the Equal Protection
Clause. See United States v. Bongiorno, 106 F.3d 1027, 1034 (1st
Cir. 1997) (holding that a party may waive questions of
constitutional dimension).

 IV
 Having repulsed the appellant's attacks on 18 U.S.C. 
922(g)(9), we turn now to 18 U.S.C. 922(g)(8). Meade raises two
constitutional challenges to this provision.
 First, Meade asserts that section 922(g)(8) affronts the
Tenth Amendment, U.S. Const. amend. X, because it promotes
interference by the federal government in state civil proceedings. 
The United States responds that the statute requires proof, in each
and every case, that the firearm in question was transported or
sold in interstate commerce. See infra note 3. Thus, the
government reasons, enactment of the statute falls within
Congress's regulatory power under the Commerce Clause, U.S. Const.
art. I, 8, cl. 3.
 The Tenth Amendment reserves to the states all powers not
vested by the Constitution in the federal sovereign. See Printz v.
United States, 117 S. Ct. 2365, 2376-77 (1997). It is settled
beyond peradventure that if Congress properly acts pursuant to one
of its enumerated powers, its work product does not offend the
Tenth Amendment. See Gregory v. Ashcroft, 501 U.S. 452, 460
(1991). The question, then, is whether the enactment of section
922(g)(8) represents a valid exercise of congressional authority
under the Commerce Clause.
 It is true, as the government observes, that courts
regularly have upheld the use of a case-by-case jurisdictional
element, such as imbues this statutory scheme, as a means of
satisfying the required nexus with interstate commerce, and, thus,
bringing federal legislation within the shelter of the Commerce
Clause. See, e.g., United States v. Cunningham, 161 F.3d 1343,
1345-57 (11th Cir. 1998); United States v. Pierson, 139 F.3d 501,
502-03 (5th Cir.), cert. denied, 119 S. Ct. 220 (1998); United
States v. Joost, 133 F.3d 125, 131 (1st Cir.), cert. denied, 118 S.
Ct. 1545 (1998). But Meade casts his argument at a slightly
different angle. He notes that section 922(g)(8) is separate and
apart from the jurisdictional element that underlies the whole of
section 922(g), and ruminates that section 922(g)(8) in and of
itself represents an undue imposition on state sovereignty.
 This proposition is simply incorrect. Section 922(g)(8)
does not in any way intrude upon state court proceedings, or upon
the authority of a state or its agents to administer their domestic
relations laws in the manner they see fit. Stripped to bare
essence, section 922(g)(8) makes the existence of a state court
order an element of a federal misdemeanant-in-possession offense 
no more and no less. Nothing in the state court proceeding changes
on account of, or is in any way affected by, the operation of the
federal law. Thus, section 922(g)(8) is totally devoid of Tenth
Amendment implications. See Bongiorno, 106 F.3d at 1033-34
(holding that the federal Child Support Recovery Act did not
violate the Tenth Amendment because it came "into play only after
a state court issue[d] a child support order," and it did "not
authorize a federal court to revise the underlying decree").
 Next, Meade maintains that section 922(g)(8) violates the
Due Process Clause because it does not mandate that state court
restraining orders inform those whom they enjoin of the federal law
consequences that may attach. The issue of notice, in the
constitutional sense, customarily centers around whether a law
explains with sufficient clarity the conduct that it purports to
criminalize. See, e.g., Bouie, 378 U.S. at 350-51. In the case of
section 922(g)(8), the statute satisfies the standards embedded in
precedent; both the proscribed conduct and the affected class of
persons are explicitly set forth. Accord United States v. Wilson,
159 F.3d 280, 288 (7th Cir. 1998), petition for cert. filed (Mar.
29, 1999) (No. 98-8724).
 The appellant attempts to put a spin on the notice
argument by touting Lambert v. California, 355 U.S. 225 (1957). 
Lambert represents one of the relatively rare instances in which
the Supreme Court has concluded that, contrary to the well-
established tenet, actual knowledge of the law's requirements is a
precondition to criminal liability (and, therefore, ignorance of
the law will excuse the defendant). See id. at 228-29. 
Specifically, the Lambert Court held that a law which imposed
strict liability upon convicted felons for mere presence in a
municipality was constitutionally infirm because, without
forewarning, it punished conduct that a reasonable person
ordinarily would not consider to be criminal. See id.; see also 
United States v. Freed, 401 U.S. 601, 608 (1971) (explaining
Lambert and noting that "[b]eing in Los Angeles is not per se
blameworthy").
 A significant problem with this aspect of the appellant's
argument is that the Court has steadfastly resisted efforts to
extend Lambert's reach, see, e.g., id. at 609 (declining to extend
Lambert to possession of hand grenades), and has gone so far as to
suggest that the Lambert dissent correctly characterized the
majority opinion as "an isolated deviation from the strong current
of precedents a derelict on the waters of the law." Texaco, Inc.
v. Short, 454 U.S. 516, 537 n.33 (1982). Thus, any attempt to
introduce Lambert into new environs must be viewed with great
circumspection.
 Meade nevertheless tries to bring his case within the
Lambert exception by arguing that firearms possession is an act
sufficiently innocent that no one could be expected to know that he
would violate the law merely by possessing a gun. As Staples v.
United States, 511 U.S. 600, 610-12 (1994), makes clear, firearms
possession, without more, is not a kind of activity comparable to
possession of hand grenades, see Freed, 401 U.S. at 609, narcotics,
see United States v. Balint, 258 U.S. 250, 253-54 (1922), or child
pornography, see United States v. Robinson, 137 F.3d 652, 654 (1st
Cir. 1998). But possession of firearms by persons laboring under
the yoke of anti-harassment or anti-stalking restraining orders is
a horse of a different hue. The dangerous propensities of persons
with a history of domestic abuse are no secret, and the possibility
of tragic encounters has been too often realized. We think it
follows that a person who is subject to such an order would not be
sanguine about the legal consequences of possessing a firearm, let
alone of being apprehended with a handgun in the immediate vicinity
of his spouse. Accord United States v. Bostic, 168 F.3d 718, 722-
23 (4th Cir. 1999); Wilson, 159 F.3d at 288-89; cf. Tart v.
Massachusetts, 949 F.2d 490, 503 (1st Cir. 1991) (rejecting a
Lambert challenge to a state commercial fishing permit
requirement).
 In short, we do not believe that the prohibition of
section 922(g)(8) involves conduct and circumstances so
presumptively innocent as to fall within the narrow confines of the 
Lambert exception. We therefore reject the appellant's contention
that the statute, on its face, violates due process rights of
notice.
 V
 We need go no further. The first of the firearms
statutes at issue here 18 U.S.C. 922(g)(9) is by no means a
model of draftsmanship, but the appellant's gloss upon it cannot be
sustained by any reasonable method of statutory interpretation. 
The second statute, 18 U.S.C. 922(g)(8), easily withstands the
appellant's multifarious constitutional attacks.

Affirmed.